## LEWIS ET AL., v. CHARLES SEIFERT.

ERROR TO THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY.

Argued March 9, 1887—Decided October 3, 1887.

1. One who enters upon the service of another, takes on himself all the ordinary risks of the employment, and the negligent acts of fellow-workmen in the general course of the employment are within those ordinary risks.

2. To constitute fellow servants within the rule, employees need not be at the same time engaged in the same particular work, provided they are in the employment of the same master, engaged in the same common work, and performing duties and services for the same general purpose; and this, though one injured may be inferior in grade and subject to the direction and control of a superior whose act has caused the injury.

3. But there are duties which the master owes to a servant, from which he cannot relieve himself except by performance; and when these duties are delegated to an agent, such agent stands in the place of the principal and the latter is responsible for his acts.

4. When the master or superior places the entire charge of his business, or a distinct branch of it, in the hands of an agent or subordinate, exercising no discretion or oversight of his own, the master is liable for the negligence of such agent or subordinate.

5. A train dispatcher wielding the power and authority of a railroad company in the moving of trains, in the changing of schedules or the making of new ones as exigencies require, is not a fellow servant with a train-employee; and for his negligence, which is the proximate cause of an injury to such employee, the company is liable in damages.

6. The testimony of practical railroad men, called as experts to testify as to the proper methods of passing trains on a single-track road, is admissible.

### Statement of Facts.

7. *Semble :* In an action for injuries from negligence against the receivers of a railroad corporation, service of the summons may be made by the sheriff of the jurisdiction upon the defendants in any county or place where found.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STER-RETT, GREEN and CLARK, JJ.

No. 213 July Term 1886, Sup. Ct.; court below, No. 48 February Term 1882.

Under the authority of an order from the Circuit Court of the U. S., E. D., on February 8, 1882, this suit was brought by Charles Seifert against Edwin M. Lewis, F. B. Gowen and Stephen A. Caldwell, receivers of the Philadelphia & Reading R. Co. The plaintiff was a locomotive engineer in the employ of the defendants, and ran a freight train, No. 71, between Philadelphia and South Bethlehem, on the North Penn. branch of said railroad. On the morning of February 10, 1881, his engine was struck and demolished by a passenger Express, known as No. 8, in which collision he received serious and permanent injuries for which he subsequently brought this suit.

No. 8 left South Bethlehem at 9 A. M., 30 minutes late, with orders to pass No. 3, fast line, at a stop at Souderton, and stopped as usual at Hellerton, Centre Valley, Coopersburg and Quakertown. The next stop after Quakertown, on the schedule, was Perkasie, and Souderton was still south of Perkasie. No. 71 started from Philadelphia at 3 : 30 A. M. and ran on schedule time to Perkasie, where the conductor was ordered to meet and pass No. 8 at Rockhill, which is not a station, but a telegraph office and siding for passing trains. On nearing Rockhill, the engineer and conductor of No. 71 observed the signal board turned in their favor as a signal to enter the siding ; and as the engine slacked its speed, the conductor alighted and inquired of the operator " how No. 8 was," and was informed that No. 8 had left Quakertown four minutes before. The conductor then ordered the brakeman to flag No. 8, but before the brakeman had walked three car-lengths forward, No. 8 came down the track at a high rate of speed and struck No. 71 as it was entering the switch. The other facts relevant to the questions raised sufficiently appear in the charge to the jury and in the opinion of this court.

The defendants were served with the summons by the sheriff of Northampton county at Philadelphia. A motion to set aside the service was refused. " April 6, 1885, defendants still objecting to service of summons, pleaded not guilty."

June 8, 1886, jury called :

Defendants now object to the jury being sworn as to Edwin M. Lewis : defendants suggest the death of Edwin M. Lewis and object to the jury being sworn on that account, and further object to the jury being sworn because there has been in this case no legal service of process upon the receivers.

By the court : The objection is overruled and bill sealed for the defendants.[5]

Newberry Fuller, sworn for plaintiff :

Q. Suppose a passenger train was running upon a single track railroad south, behind time, with right of way to proceed, and that upon the same road there was coming north a freight train, and the freight train had received special orders to proceed to a certain siding to meet and pass a passenger train, and that the passenger train passed the last telegraph office at which they could receive notice of the intended passing of the freight train without receiving orders that they would pass the freight train at the siding ; state whether or not in your judgment that is good railroading or bad railroading ?

Objected to as incompetent and irrelevant and because the witness has shown no such experience in operating a single track railroad as would authorize him to express an opinion.

By the court : The objection is overruled and bill sealed for the defendants.[6]

A. Well, it is different from what I would do.

Q. It is not what you would approve in your judgment?

A. No, sir.

Charles Seifert, sworn in his own behalf :

Q. As a railroad man, state what in your opinion would have been the proper method to pass the passenger train which on the 10th of February was running south under the conductorship of Edward Hamman and the freight train running north under McGargle ; what in your judgment would have been the proper proceeding to have passed your two trains in safety ; where should Mr. Edward Hamman, the conductor of the passenger train, have received his notice ?

Objected to as incompetent and irrelevant.

By the court: The objection is overruled and bill sealed for the defendants.[7]

A. Well, I should think that Ed. Hamman ought to have received his orders at Quakertown.

James C. Johnson, sworn for plaintiff:

Q. Suppose a case where a passenger train on the North Penn. R. was running south towards Philadelphia and it had started out of South Bethlehem 30 minutes late—they had orders to proceed south to Souderton—and suppose at the same time there was a freight coming up from Philadelphia that had reached a station called Perkasie, and that at Perkasie the freight train received orders to proceed to Rockhill, which is between Perkasie and South Bethlehem; state whether or not in your judgment it was good railroading or bad railroading to let those two trains approach under those circumstances?

Objected to as incompetent and irrelevant.

By the court: The objection is overruled, defendants except and bill sealed.[8]

A. I do not know what the rules and regulations are on the North Penn. road—on our road. Q. For safety in railroading what in your judgment would be the proper course to pursue to pass two trains approaching each other in that way? A. Are they both of the same class? Q. No, the passenger train had the right of way. A. You know passenger trains are first class and freight trains second class. Q. Yes. A. Yes? Well the first class train would have the right of the road, no difference whether she was an hour late or not late at all; and if she received no orders then as soon as her train was made up she would start and go, and if she received orders to run to a certain point she would go there, and if they had orders to meet a train there, no difference of what class, they would have to stop there to meet and pass that train; but if they received no orders of that kind they would go right on on their rights. Q. Would it be unsafe in your opinion to permit two trains to run towards each other to pass at a given point, each one with the right of way, without knowing of their approaching each other, each one ordered to proceed without knowing that they were approaching each other, would that be good or bad railroading in your opinion? A. Well, they would not give an order of that kind.

Charge of Court below.

The court, H. J. REEDER, J., charged the jury :

The duty which the law requires shall be performed by a railroad company differs materially in the case of passengers from that of employees. With passengers the company contracts that it will carry them to their destination without exposing them to danger by the acts either of themselves or their employees. With employees there is no such rule. All known dangers that are incident to the employment are undertaken at the risk of the employee. As a general rule the employee cannot recover for an injury sustained by him in the course of his employment not received directly from the employer himself. There are exceptions to this rule; first, where the injury is the result of improper machinery, tools or appliances furnished the employee by his employer; and second, where the injuries result from the incompetency of a fellow servant employed by the master who knew of his incompetency at the time of his employment, or, by the exercise of ordinary care and diligence could have discovered it. There are other exceptions to the rule besides these general exceptions, growing out of the peculiar character of the business in and about which the employee is employed. Thus, in a railroad company which employs men in the running of trains, it is the duty of the company to furnish them with rules and regulations for the running of trains which are ordinarily safe. They must furnish them also with time tables for the running of trains, which will enable them to perform the duties incident to their employment with ordinary safety. In case of delays, or of trains running on special time, or on a special schedule, it is the duty of the company to direct the trains by such orders as will conduct them to their destination avoiding ordinary and known dangers and risks.

A company operating a railroad has a right, as regards its employees, to vary from the regulation time tables in running trains, and all that is required is due care and diligence in giving notice of the change, and, in running the train upon the changed time, it is not required that the company should see to it personally that notice of such a change comes to the knowledge of all those to be governed thereby. The duty of the master is performed when he provides beforehand and makes known to his servants regulations explicit and efficient,

which, if observed and followed by all concerned, will bring notice to every one entitled to it. [It is the duty of the company to arrange and promulgate the general time table of the railroad and where there is a variation from the general time table for special purposes, it is the act of the company and it is obliged to promulgate it. It is the duty of the railroad company to see and know that its general time table is brought to the knowledge of its servants who are to square their actions to it. It is just as much its duty to do so with reference to a variation from it, which is but a special time table. Whomsoever the company uses to bring such time tables or variations from its regular time tables to the notice of its servants, does so in the company's place and stead, inasmuch as it is the company's duty to see it done and done effectually. The act, therefore, of the person delegated to do that which it is the company's duty to do, is the act of the company itself, and if the person so delegated performs the duty carelessly and negligently it is the negligence of the company.] [2]

That a railroad company has the right to vary from its regular time table cannot be doubted. It is at times necessary to do so, and the necessity is so frequent that it falls within the class of occurrences that a railroad servant is bound to accept in the course of his employment. All that is required of the company is due care and diligence in giving notice of the change, and in running the train upon the changed time. If, after the company has made the change, they make use of the usual appliances for promulgating notice of the change, they have done all the law requires of them. If through the fault or neglect of a telegraph operator, conductor or other employee, the orders of the company do not reach those for whom they are intended and injury results, that is not the negligence of the company. The duty of the company was performed when they took the usual methods through its delegated agent to promulgate the order to those whom it affected, and if, through the negligence of those whose duty it was simply to act as the messengers of the company in conveying the orders of the company to those for whom they are intended, the orders were not delivered, or were not understood, that is the negligence of the fellow servant for which the company would not be liable. These are general principles of the law which are applicable, as I understand the law, to this case.

It is not disputed that upon the 10th day of February, 1881, Charles Seifert was an engineer upon a local freight train, in the employ of the defendants in this case, on the North Penn. branch of the Philadelphia & Reading Railroad Company; that they were at Perkasie, which is a station along the line of the road at which there was a switch; that while they were there in the vicinity of this switch the conductor of the train received orders from a train dispatcher in Philadelphia, John J. Sellers, to proceed to Rockhill and there to draw upon the side track and to await the passing of train No. 8, which was ·the fast express running on its way from Bethlehem to Philadelphia. After the receipt of the orders they did some shifting, and then, as they proceeded to draw out, a link was broken, or a drawhead pulled out—which it was, gentlemen of the jury, is for you to determine—but it is undisputed that there was a delay of the train in consequence of this accident, according to one of the witnesses, of from five to six minutes, and according to another witness, of about ten minutes; that after this accident had been repaired, they then proceeded without receiving further orders to their destination at Rockhill, and as they were pulling off upon the side track, the express train came along, crashed into the engine of the local freight train and injured the plaintiff, Charles Seifert, the engineer.

Was this accident the result of negligence upon the part of anybody? This is a question of fact that is peculiarly within your own province and one that you must determine. If the accident was the result of the condition of the road, if it was the result of the character of the day for which nobody was responsible, then the plaintiff would not be entitled to maintain this action or receive a verdict in his favor. If it was the result of negligence, whose negligence was it?

[John J. Sellers was an assistant train dispatcher or train runner in Philadelphia. He was an assistant to Mr. W. Bertolette who was the general train dispatcher in charge of the running of all the trains upon several of the branches of the Philadelphia & Reading Railroad, of which this North Penn. branch was one. It was his duty to direct all trains when to proceed and when to stop and where to pass. In his absence that duty was delegated to one of his assistants with precisely the same discretion that he had himself. John J.

Sellers, therefore, was the person who that morning was in charge of the running of all trains upon that road as train despatcher. It was he who sent the order to Perkasie directing the train of which Charles Seifert was the engineer to proceed to the side track at Rockhill and there await train No. 8.] [3]

It is contended by the plaintiff, that the fact is as testified to by Sellers in his examination in chief, that prior to his sending the dispatch to Perkasie directing the local freight train No. 71, to proceed to Rockhill, he telegraphed to Coopersburg and Quakertown trying to get orders to train No. 8. He afterwards testified in his subsequent examination, in correction of that portion of his testimony, saying that it was not until after he had telegraphed to Rockhill and Perkasie, that he tried to reach No. 8 with orders to stop at Rockhill and there to pass No. 71. Which of these statements is true, is a question of fact for you, in determining the question as to whose negligence, if it was the result of negligence at all, caused the injury for which Charles Seifert seeks to recover in this case.

The defendant claims, that if the injury resulted from negligence at all, it was the result of the negligence of the station agent at Rockhill. You will remember that after Sellers had given the orders to the station agent at Rockhill to stop express train No. 8, and that it would pass No. 71 there, and that he should stop No. 8 so as to enable them to pass, that he did nothing further. If that was sufficient, if that was all that was required of him to do according to the evidence of the usual methods of running trains upon single track railroads, then John J. Sellers was not guilty of any negligence in the sending of that dispatch to Rockhill and not sending it to the station above. If, however, you believe, from the testimony of the witnesses who were upon the stand that the sending of the message to Rockhill above was not the full performance of what was required under the circumstances, and in running trains upon a single track road, then you will have to inquire further and determine whether John J. Sellers did that which the law requires that he should do on behalf of this company in order to relieve himself from the charge of negligence.

He testifies that he tried to stop train No. 8 by telegraphing to Coopersburg and Quakertown, but could not raise those

offices because of the condition of the weather. Whether he did so or not, through the operator John Cook, is a question of fact for you. If you believe that he did so, then that is an element that you must, a fact that you must take into consideration in determining whether or not he was guilty of negligence. If you believe that he did not, then that is a fact that you must take into consideration in determining the question whether he was guilty of negligence or not. You have also the right to take into consideration the question, whether, when he found that he could not raise Quakertown and Coopersburg in order to convey to the conductor of train No. 8 the order that he would pass No. 71 at Rockhill, he did his whole duty when he stopped there without trying other methods for the purpose of reaching train No. 8 in order to convey to them the information, and contented himself with sending word to Rockhill. If you believe that he did not convey information to No. 8, so that they would have had knowledge of the fact that they would pass No. 71 at Rockhill and could run by Rockhill with the train under control, then you will determine whether that was rendered impossible by reason of the condition of the weather.

If it was impossible by reason of the character of the morning, by reason of its being wet and foggy, and the condition in which the wires were, for him to reach the stations which it was necessary for him to reach in order to notify train No. 8 that they would pass train No. 71, then he was excusable for not giving such notice, if he was not required, in your judgment, from the evidence, to adopt, in the performance of his duty, other methods, or to make other attempts in order to reach them; and if, in your judgment, from the testimony, any other attempts to reach them by telegraph in order to convey to them the information would have been futile, for the same reason that you believe that it was impossible, if you do so believe, for him to have reached No. 8 at Coopersburg or Quakertown.

The law does not require a man in the performance of his duty to do that which it is rendered impossible for him to do by the act of God. When the condition of the elements have been such as to render the performance of a duty impossible the law excuses him from the performance of that duty.

Therefore, I say to you, that if you find from the testimony that it was impossible for him to reach these places by telegraph because of the condition of the weather on that morning, and that he had done all that was required of him to do in his attempt to reach these places, and that these places were the points, and the only points, where in the performance of his duty he was required to telegraph to convey this information to No. 8, then we say he was excusable and the law would not hold him responsible. You will consider in this connection whether he was in the full performance of his duty when he simply telegraphed to the operator or agent at Rockhill "stop No. 8," whether on account of the character of the morning, and the methods in vogue along that railroad, that was sufficient to enable the agent at Rockhill to stop that train without further instructions, or whether it was the duty of the agent at Rockhill to leave his house and go up the track a sufficient distance to flag that train in order to stop it. If it was his duty, under the evidence, and you believe it to have been such—to have gone up the road to flag the train and stop it—to flag it within such a distance as to enable it to stop with safety, then it was the station agent's fault, it was his negligence that occasioned the accident.

If however you believe, under the testimony—if you believe, under the construction of that rule, and the testimony in relation to it, that it was his duty to notify or signal train No. 8 from his station without leaving it, then he did all that his duty required him to do and he was not guilty of negligence. In this connection you will remember that Mr. Bertolette testifies that he saw all the agents along the railroad at one time and instructed them in regard to their duty. What he says specifically in regard to any instructions given by him to Roth, the operator at Rockhill, concerning his duty upon an occasion such as this, about flagging an approaching train by going up the track I do not remember. You will recall his testimony and if you find that Bertolette ever gave such instruction as that to Roth, the agent in charge of Rockhill station, and Roth, on that morning did not obey it, then it was the negligence of the agent at Rockhill that occasioned the injury.

[If it was the concurrent negligence of the agent at Rock-

Charge of Court below.

hill and John J. Sellers, and if, under the instructions of the
court, as I shall further charge you, you find that John J.
Sellers was not a fellow servant of Charles Seifert, and there-
fore was the agent of the company for whose act the com-
pany was responsible, then I say to you that the fact of the
negligence of the Rockhill agent concurring with the negli-
gence of John J. Sellers to cause the accident would not ex-
cuse or relieve the receivers of the railroad company from
liability.

If you should find that this accident was the result of
the negligence of John J. Sellers, or if you should find that it
was the result of the negligence of John J. Sellers concurring
with the negligence of the station agent at Rockhill, then it
will be your duty to determine, under the instructions of the
court, whether John J. Sellers was a fellow servant of Chas.
Seifert or not. If he was a fellow servant engaged in a com-
mon work, then the law would relieve this company from any
responsibility because of the negligence of John J. Sellers.
If, however, John J. Sellers was acting in the capacity of
the company itself, was performing duties delegated to him
by the company which it was the company's duty to perform,
then the negligence of John J. Sellers was the negligence of
the company. As I said to you at the beginning of my charge,
it is a railroad company's duty to promulgate any orders in
regard to any variation of time in the running of trains.]⁴
Train No. 8 was not on time; it had left Bethlehem, I think,
30 minutes late. The other train at Perkasie was also late.
I do not recollect the testimony exactly, but I think that one
of the witnesses testified that they came to Perkasie late.
Another of the witnesses, Magargle, says that he does not
remember whether they were late in running in to Perkasie or
not, but that they were late in leaving Perkasie. They re-
ceived specific orders from John J. Sellers to go on. It was
his duty that morning to direct the running of the trains. It
was not in the power of the men on train No. 71 to know the
whereabouts of train No. 8.

[It was the duty of this company to keep these trains in-
formed of each other's whereabouts and to protect them from
the danger of collision. If the company, whose duty it was
to afford a special time table to these two trains so that they

could pass upon this single track road in safety, then, when they delegated that duty to Mr. Bertolette, and through Bertolette to Sellers, Sellers was doing that which it was the company's duty to do and his act was the company's act and his negligence, if any, was the company's negligence. Therefore, if you believe that John J. Sellers's negligence alone, or the negligence of John J. Sellers in connection with the negligence of Roth the station agent at Rockhill, occasioned this accident, then the company would be liable for whatever injury Charles Seifert, one of the employees, sustained by reason of the collision.] [4]

This brings us to the last consideration, gentlemen of the jury, which is the measure of damages by which you would regulate your verdict in case you should find a verdict in favor of the plaintiff. . . . . .

The defendants have submitted a point to the court in which they ask the court to say to you that under the law and evidence of the case the verdict of the jury must be for the defendant. This point we deny. We decline to affirm this point.[1]

I want to add to what I have said, counsel having just called my attention to it as having been omitted in my general charge, that if you believe, from the testimony, that this accident was the result of the negligence of the operator at Rockhill, without the concurring negligence of John J. Sellers, but that it was the negligence of Roth alone that occasioned the accident, then the company would be absolved from all liability in the matter, as Roth was such a fellow servant as would not make the company liable to the other employees for any of his acts; and if, therefore, the accident, which resulted in the injury complained of here, was the result of the negligence of Roth, the station agent at Hockhill it will be your duty to render a verdict in favor of the defendant.

Under this charge the jury rendered a verdict in favor of the plaintiff for $5,000, and judgment being entered thereon the defendants took this writ, assigning for error :

1. The refusal to affirm defendants' point.[1]

2, 3. The parts of the charge embraced in [ ][2] [ ][3]

4. The parts of the charge embraced in [ ][4] [ ][4]

5. The overruling of defendants' objection to the jury being sworn.[5]

6, 7, 8. The overruling of defendants' objections to plaintiff's offers.[6] [7] [8]

*Mr. Wm. Mutchler* and *Mr. R. E. Wright* for the plaintiffs in error.

1. Were the relations of John J. Sellers, the assistant train dispatcher, to Seifert, such that the receivers are responsible to Seifert for injuries resulting to him from the negligence of Sellers? We submit as a true statement of the rule: Whenever the negligent act of the agent which the injured party complains of, is one which when he entered the employment he understood would be performed by an agent and not by the master personally, and it was an act which the master did not owe to the employee to perform personally, such act and the risk of its being negligently performed is one of the risks the employee assumed when he entered the master's service. Employees standing in that relation are fellow servants. The question of grade and authority is of no importance: Lehigh V. Coal Co. v. Jones, 86 Penn. St. 432; Waddell v. Simoson, 112 Idem 567; Campbell v. Penn. R. Co., 17 W. N. 73; Del. & H. Canal Co. v. Carroll, 89 Penn. St. 374; Keystone Bridge Co. v. Newberry, 96 Idem 246; Baird v. Pettit, 70 Idem 477; Ardesco Oil Co. v. Gilson, 63 Idem 147; Weger v. Penn. R. Co. 55 Idem 460; Caldwell v. Brown, 53 Idem 458; Ryan v. Railroad Co., 23 Idem 384; National Tube Works v. Bedell, 96 Idem 175. In all the cases in which this court held the master liable for an injury to one servant by the negligence of another, the negligent act related to some duty which the master owed the servant. Thus in Mullan v. Steamship Co., 78 Penn. St. 26,—called a close case in Lehigh V. Coal Co. v. Jones, 86 Penn. St. 442; Tissue v. Railroad Co., 112 Idem 91.

2. The master may delegate to servants the management of his business in all matters except those which relate to duties which he personally owes to employees; and he is not liable to his servants for the negligence of such an agent, except where the negligence relates to the duties which the master owes the servant. As to all other matters, the agent is the fellow servant of the employee, and the employee assumes the risk of his negligence: Howard v. Railroad Co., 24 Amer. & Eng. R. C. 448; Kirk v. Railroad Co., 25 Idem 507; Robert-

son v. Railroad Co., 8 Idem 175 ; Blessing v. Railroad Co., 15 Idem 298 ; Darngan v. Railroad Co., 23 Idem 447 ; 3 Wood's R. L. 1494–98, 1500–01 ; Crispin v. Babbitt, 81 N. Y. 516 ; Wood's M. & S. 852–54.

3. The theory pressed most earnestly is, that Sellers was the vice-principal of the receivers and stood in their place and stead so as to make them .responsible for his acts. This doctrine is nothing more than that when the master turns over the entire management of his business or a department of it to another, exercising and reserving no control or supervision himself, and by so doing delegates to another the performance of those duties which the master personally owes to the servant, or which from the nature of the business the employee had a right to presume the master would himself perform ; in such case such an agent does become a vice-principal as to such duties, and in performing those duties the agent's negligence becomes the negligence of the master. If, however, the negligence relate to acts which the master was not bound to perform personally, or which from the nature of the business the servant could not reasonably expect he would perform personally, as to such acts the agent is not a vice-principal, but a fellow servant : Patterson's Ry. Acc. Law, 320, 328, 360, 363 ; Farwell v. Railroad Co., 4 Met. 48 ; Summersell v. Henry, 117 Mass. 312 ; Zeigler v. Day, 123 Mass. 152 ; McDermoth v. Boston, 133 Mass. 349 ; Kenney v. Shaw, 133 Idem 501 ; Flynn v. Salem, 134 Idem 351 ; Floyd v. Snyder, 134 Idem 563.

4. Can it be possible that on an extended railroad system covering thousands of miles with ten thousand trains moving every day upon special orders, sometimes ordered by the wave of a hand, the swinging of a lantern, the turning of a signal or the use of a telegraph, that whenever an engine or a train is moved except upon a fixed inflexible time table, it becomes the duty of the receiver personally to intervene and give the order ; that this is a duty which the receiver personally owes to the servant as an individual performance ? The doctrine is absurd and impossible. The evidence was that on this one single branch five persons were necessarily and fully employed in performing such duties ; that the extent of the

business of these receivers was such that a hundred train dispatchers scarcely essayed to perform these duties.

5. The court erred in admitting expert testimony as to whether the acts of Sellers were "negligent" or "good railroading:" Ferguson v. Hubbell, 97 N. Y. 507; Nowell v. Wright, 3 Allen 170 ; Emerson v. Gas Light Co., 3 Idem 411; Raymond v. Lowell, 6 Cush. 524 ;. Simons v. Steamboat Co., 97 Mass. 362; Foster v. Collmer, 107 Penn. St. 313.

6. We do think it was error to permit the jury to speculate as to what additional precautions might have been taken and then pronounce it negligence not to have taken them, when it is the undisputed evidence that if the orders that Sellers gave had been obeyed by those to whom they were given, there would have been no accident: Pittsb. S. R. Co. v. Taylor, 104 Penn. St. 306; Penn. R. Co. v. Hope, 80 Idem 373 ; Hoag v. Railroad Co., 85 Idem 293; West Phila. P. Ry. Co. v. Gallagher, 16 W. N. 413.

7. We submit there was no legal service of process on the receivers. We took advantage of the want of it at every stage of the proceedings.

*Mr. Wm. C. Shipman* (with him *Mr. Robert E. James*), for the defendant in error:

A servant by implication contracts to bear the ordinary and usual risks of the employment which he enters. Yet there remains with the master, by implication also, certain obligations which he undertakes. Stated generally, he must furnish suitable instrumentalities to carry on his work. This, of course, includes safe machinery, competent co-laborers, suitable places to work, and the. giving of proper directions and taking due precautions in the use of them. The policy of the law forbids that he should free himself from these obligations, either by contract with the servant, or by his own act in intrusting them to another servant. Hence the servant who is intrusted with the performance of these duties, is the representative of his master, who then becomes liable for the servant's negligence. And where the master delegates the whole or a particular branch or department of his business to his servant, the latter becomes the representative of the master and is called a vice-principal: Green & Coates St. P. Ry. Co. v.

Bresmer, 97 Penn. St. 103; P. W. & B. R. Co. v. Keenan, 103 Idem 124; Tissue v. Railroad Co., 112 Idem 91; Holden v. Railroad Co., 129 Mass. 268; Patterson's Ry. Acc. L. §§ 307–9; 3 Wood's Ry. L. 1498; Crispin v. Babbith, 81 N. Y. 516; Wood's M. & S. §§ 403, 438; Slater v. Jewett, 84 N. Y. 61; Patterson v. Railroad Co., 76 Penn. St. 389; Mullan v. Steamship Co., 78 Idem 25; N. Y. L. E. & West. R. Co. v. Bell, 112 Idem 400; Lehigh V. Coal Co. v. Jones, 86 Idem 439; Patterson's Ry. Acc. L. § 302; Darrigan v. Railway Co., 52 Conn. 285; Wilson v. Linen Co., 50 Idem 433; C. B. & Q. R. Co. v. McSallen, 84 Ill. 109; Sheehan v. Railroad Co., 91 N. Y. 332; Flike v. Railroad Co., 53 N. Y. 549; P. C. & St. L. R. Co. v. Henderson, 5 Amer. & E. R. C. 529; McKinne v. Railroad Co., 21 Idem 539; Phillips v. Railroad Co., 23 Idem 453; Washburn v. Railroad Co., 3 Head (Tenn.) 638.

2. There was no error in the admission of the expert testimony: 1 Greenl. Ev. § 440; Laros v. Commonwealth, 84 Penn. St. 200; Yardley v. Cuthbertson, 108 Idem 395.

3. The defendants moved to set aside the service which was refused. They pleaded upon a rule served, a waiver of any defective service. They then had but one of two courses to pursue; to come in and defend, or to stay out and take the risk: Lycoming Ins. Co. v. Storrs, 97 Penn. St. 354. But the service in Philadelphia by the sheriff of Northampton county was good: § 42, act of June 13, 1836, P. L. 579; for the receivers are certainly the principal officers of the corporation: High Rec., §§ 314, 315. All remedies by and against corporations subsist by and against the receivers: High Rec. §§ 201–3, 395; Wert v. Keim, 2 Pa. C. C. R. 405.

OPINION, MR. JUSTICE PAXSON:

It is clear that if this railroad accident was the result of the negligence of the station-agent at Rockhill, the plaintiff cannot recover, for the reason that said station-agent and the plaintiff were engaged admittedly in the same common employment. Seifert, the plaintiff, was the engineer of No. 71 freight train, and was injured by No. 8 passenger train colliding with it just as it was entering the switch at Rockhill to allow No. 8 to pass. Roth, the station-agent, had been ordered by wire to "stop and hold No. 8 Express at Rockhill until

No. 71 local freight arrives." When he received the order he proceeded to flag No. 8 with the red signal. This was all he was required to do by the rules of the company in obedience to the telegram. This fully appears by the testimony of Mr. Sellers, the train-dispatcher, who sent the telegram, and who was called as a witness by the defendant company. We must look elsewhere for a solution of this difficulty.

It is equally clear that had no order been sent from Philadelphia there would have been no accident. In the absence of special orders, No. 71 would, under the rules of the company, have taken the siding at Perkasie and have waited until No. 8 passed. The accident was the direct result of the order from the office in Philadelphia to the conductor and engineer of 71, which was as follows: "you will meet and pass No. 8 Express at Rockhill." It remains to be seen whether the defendant company is responsible to the plaintiff below for the injuries he received in consequence of this order.

The facts briefly stated are as follows:

No. 71, local freight train, with the plaintiff below on board as engineer, left Philadelphia at 3:30 A. M. for South Bethlehem, and arrived at Perkasie, two miles and a half south of Rockhill. This portion of the road at that time had but a single track. When No. 71 arrived at Perkasie it was behind time, and it was the duty of the conductor to do one of two things, viz.: either to take the long siding at Sellersville, or wire to Philadelphia for orders. He chose the latter course. He went into the office at Perkasie, called up the Philadelphia office by telegraph, and asked for orders for No. 71. The Perkasie operator was asked by Philadelphia how soon No. 71 would be ready to leave, and the answer was wired back, "in a few minutes." Then at 8:55 A. M. the operator at Philadelphia sent the following telegram to the agent at Rockhill: "Agent Rockhill: Stop and hold No. 8 Express at Rockhill until No. 71 local arrives there." Signed "W. Bertolette." Bertolette was the train-dispatcher at Philadelphia, and had full authority to start out and control the trains even to the suspension of the regular schedules. The telegram was signed by Sellers, his assistant, for Bertolette; but that is immaterial. Sellers had the same power as Bertolette, in the absence of the latter.

No. 71 was going North. No. 8 Express passenger train should have left South Bethlehem at 8 : 30 A. M. It was delayed for connections and did not leave until about 9. It was behind time as before observed, and having the right of way ran at a high rate of speed. It does not appear that any attempt was made to notify No. 8 of the whereabouts of No. 71, until the order to start the lattter train had been given. Then an attempt was made to intercept it by calling up the operators along the line above Rockhill, but it met with no response. It was alleged the wires were not working above Rockhill, and there was a dense fog along the line between that place and Bethlehem but none in Philadelphia. No. 8 having the right of way and no warning of danger, kept on at a speed of from 30 to 35 miles an hour, until it reached Rockhill. The fog prevented the danger signal there from being seen, and No. 8 struck No. 71 just as the latter was entering the switch. When No. 71 arrived at Rockhill, the engineer and conductor thereof observed the signal board at the telegraph office turned in their favor as a signal to enter the siding. As the engine slacked its speed the conductor jumped off and inquired of the operator " how No. 8 was ? " He was. informed that it had left Quakertown four minutes ago. The distance between the two places was only two or three miles. The conductor then told his brakeman to go and flag No. 8. It was too late. Before the brakeman could proceed any distance the collision occurred.

It will be seen that each of these two trains, running in opposite directions, had the right of way. The train-dispatcher in Philadelphia doubtless expected that No. 71 would be safe on the siding at Rockhill before No. 8 should arrive there. And so it would, had it started at once upon receiving its order. It will be remembered that before issuing the order to 71, the dispatcher asked how soon it would be ready to start. The reply was "in a few minutes." With the knowledge that 71 could not start immediately, the order was given to proceed. No time was limited. In point of fact, No. 71 did not move for about twenty minutes. The delay was in part caused by the pulling out of a drawhead. No. 71 did not ask for fresh orders before starting, nor was it bound to ; it had told the dispatcher it would be ready to start in a few minutes,

and it did so. A "few minutes" is an indefinite period of time, by far too uncertain for railroad purposes.

Just here is the pinch of the case. If Bertolette had ordered No. 71 to proceed in five minutes, or if not ready by that time, to take the siding, there would have been no collision. But he left the whole matter indefinite, depending upon what the conductor of 71 might regard as a "few minutes," when a delay of a single minute might involve life or death. In every view which we can take of this case we regard this order as an act of negligence and the proximate cause of the collision.

This involves the further question whether the company defendant is responsible for the negligence of its train-dispatcher. Upon this point the authorities are numerous and far from uniform. A volume might be written upon it and not exhaust the subject. I prefer to state our conclusions without elaborating them to any considerable extent.

The precise question is, whether Sellers, the train-dispatcher, was a fellow workman with the plaintiff, within the meaning of that rule of law which holds that the master is not responsible for an injury received by an employee caused by the negligence of a co-employee, or fellow workman. That rule rests upon the sound principle that each one who enters upon the service of another takes on himself all the ordinary risks of the employment in which he engages, and that the negligent acts of his fellow workmen in the general course of his employment are within the ordinary risks: Lehigh Valley Coal Co. v. Jones, 86 Penn. St. 432. To constitute fellow-servants the employees need not be at the same time engaged in the same particular work. It is sufficient if they are in the employment of the same master, engaged in the same common work and performing duties and services for the same general purpose. The rule is the same, although the one injured may be inferior in grade, and is subject to the direction and control of the superior whose act caused the injury, provided they are both co-operating to effect the same common object: Keystone Bridge Company v. Newberry, 96 Penn. St. 246. Thus, we have repeatedly held that a "mining boss," under the act of March 3, 1870, is a fellow workman with the miners, and that the mine owners are not responsible for his negli-

gence : Delaware & Hudson Canal Co. v. Carroll, 89 Penn. St. 374.   This, however, is in part owing to the fact that the duty of appointing a mining boss is imposed upon the mine owners by the act of assembly ; hence the responsibility of the latter would seem to cease when they had exercised due care in the selection of that person.   Be that as it may, it is well settled that mere difference in rank or grade does not change the rule.

But there are some duties which the master owes to the servant and from which he cannot relieve himself except by performance.   Thus, the master owes to every employee, the duty of providing a reasonably safe place in which to work, and reasonably safe instruments, tools and machiney with which to work.   This is a direct, personal and absolute obligation ; and, while the master may delegate these duties to an agent, such agent stands in the place of his principal and the latter is responsible for the acts of such agent.   And where the master or superior places the entire charge of his business, or a distinct branch of it, in the hands of an agent or subordinate, exercising no discretion or oversight of his own, the master is held liable for the negligence of such agent or subordinate : Mullan v. The Steamship Company, 78 Penn. St. 25 ; N. Y. L. E. & W. R. Co. v. Bell, 112 Penn. St. 400.

It is very plain that it was the duty of the defendant company, as between said company and its employees, to provide a reasonably good and safe road, and reasonably safe and good cars, locomotives and machinery for operating its road.   It is equally clear that it was its duty to frame and promulgate such rules and schedules for the moving of its trains, as would afford reasonable safety to the operatives who were engaged in moving them.   This is a direct, positive duty which the company owed its employees, and for the failure to perform which it would be responsible to any person injured as a consequence thereof, whether such person be a passenger or an employee.   It would be a monstrous doctrine to hold that a railroad company could frame such schedules as would inevitably or even probably result in collisions and loss of life. This is a personal, positive duty ; and, while a corporation is compelled to act through agents, yet the agents in performing duties of this character stand in the place of and represent the principal.   In other words they are vice-principals.

If it be the duty to provide schedules for the moving of its trains which shall be reasonably safe, it follows logically that when the schedules are departed from, when trains are sent out without a schedule, such orders should be issued by the company as will afford reasonable protection to the employees engaged in the running of such trains. I am not speaking now of collisions caused by a disobedience of orders on the part of conductors and engineers, but of collisions or other accidents the result of obeying such orders.

At the time of the collision referred to, Wellington Bertolette was the general dispatcher of the defendant company, and from his office in Philadelphia had the general power and authority of moving the trains. In this he was not interfered with by the company or any one else. For the purpose of sending out the trains, he wielded all the power of the company. He could send a train out on schedule time or he could hold it back. He could change the schedule time or make new schedules as the exigency of the case required. He could send a train out without schedule, and direct its movements from his office in Philadelphia. When he issued an order the train was bound to move as he directed. The engineer and conductor had but one duty and that was, obedience. In Slater v. Jewett, 84 N. Y. 61, the late Chief Justice FOLGER thus clearly stated the duties of railways in this particular: "It is urged, and with reason, that clearly arranging and promulgating the general time table of a great railway, is the duty and the act of the master of it; and that when there is a variation from the general time table for a special occasion and purpose, it is as much the duty and act of the master, and he is as much required to perform it; that it is the duty and act of the master to see and know that his general time table is brought to the knowledge of his servants who are to square their actions to it; that the same is his duty and act as to a variation from it, which is but a special time table; and, therefore, whoever he uses to bring those time tables to the notice of his servants, he puts that person to do an act in his stead, inasmuch as the responsibility is upon him to see and know that it is done, and done effectually, and that if, instead of doing it in person, he choses to do it through an agent, that agent *pro hac vice*, is the master, and he, the master, is respon-

sible for a negligent act therein of that agent, whereby a fellow servant of him is harmed. This rule has been laid down in repeated cases in this court."

It is true the order in this case was sent by John J. Sellers. But Sellers was the assistant of Bertolette, and in his absence was clothed with all his powers. For the purposes of this case Sellers was Bertolette and Bertolette was the company.

The distinction between a general dispatcher—one who has the absolute control of all the trains upon the road—and the conductor or engineer of a train is manifest. The latter have the duty of obedience. Their business is to run their trains under orders from the dispatcher, and if an employee is injured as the result of their negligence, the company is not liable. They are in the same common employment, and are laboring together to the same end, under orders from superior authority. The argument for the plaintiff in error, if carried to its logical conclusion, would wholly obliterate all distinction between railroad employees from the president down, as they may all be said to be in one sense in the same common employment and paid by the same corporation.

While the cases are not uniform upon this subject the weight of authority is with the foregoing views. In addition to the authorities cited, we may refer to Hike v. Railroad Co., 53 N. Y. 549 ; Pittsburgh, Cin. & St. L. R. Co. v. Henderson, 5 Amer. & Eng. R. R. C. 529 ; McKinne v. C. S. R. Co., 21 Idem 539 ; McKune v. Railroad Co., 17 Idem 389 ; Phillips v. C. M. & St. Paul R. Co., 23 Idem 453 ; Phillips v. Railroad Co., 64 Wis. 475, and Washburn v. Railroad Co., 3 Head (Tenn.) 638. Against these authorities we have only Robertson v. T. H. & L. R. Co., 8 Amer. & E. R. R. C. 175, and Blessing v. St. Louis, Kansas City & Northern R. Co. 77 Mo. 410 and 15 Amer. & E. R. R. C. 298. These cases, however, do not sustain the broad principle contended for here, and if they did, we would not be disposed to adopt them in the face of so much respectable authority the other way. Aside from authority I am of opinion that the doctrine we have announced is founded upon the better reason, and is a rule both valuable and necessary for the preservation of the lives, not only of railroad employees but of the traveling public as well.

This disposes of all that is important in the case.

The sixth, seventh and eighth assignments refer to the questions asked of the expert witnesses. We think they were competent under Laros v. Com., 84 Penn. St. 200, and Yardley v. Cuthbertson, 108 Penn. St. 461.

Judgment affirmed.