MARK MORTON, ADMINISTRATOR, ETC., v. THE DETROIT, BAY CITY & ALPENA RAILROAD COMPANY.

*Master and servant—Negligence—Defective tools and appliances— Contributory negligence—Conduct of counsel—Circuit judge practicing as attorney.*

1. The rule may be considered settled in this State that a master is bound not only to use all reasonable care in providing safe tools and appliances for the use of workmen in his employ, but that this is a duty which cannot be delegated to another so as to relieve the master from personal responsibility. *Johnson v. Spear*, 76 Mich. 139; *Adams v. Iron Cliffs Co.*, 78 Id. 272 (head-note 6); *Van Dusen v. Letellier*, Id. 492; *Hunn v. Railroad Co.*, Id. 513; *Harrison v. Railroad Co.*, 79 Id. 409; *Brown v. Gilchrist*, 80 Id. 56.

So *held*, where a brakeman on a logging train was thrown from a car and killed by reason, as alleged, of the breaking of the brake-chain, which was of insufficient size or strength to be used with safety; and in a suit to recover damages for his death the railroad company claimed that its duty was fully performed when it procured chains in the usual and customary way, and employed a competent person to inspect its cars, to see that they were in good condition before starting out on a trip, which duty it performed, and that it was not responsible for the negligence of such inspector, if he was guilty of any, he being a fellow-servant of the deceased.

2. Where, in such a case, the court in his charge limited the jury, in determining the question of defendant's negligence, to the single question whether the chain was reasonably safe when it

was put on the car, and instructed them that, if they found that it was, the plaintiff could not recover, a request by a defendant for an instruction that in order to recover the plaintiff must allege that defendant had notice or knowledge of the defect complained of, or that it was negligent in not having such notice or knowledge, is properly refused.

3. In such a case the brakeman had a right to rely upon the defendant to properly test and inspect the chain before it was placed on the car for use, and, while his failure to notice *visible* defects would be negligence on his part, he was not required to go under the car, and examine the chain link by link, to see if it was in safe condition before he used it.

4. Act No. 180, Laws of 1889 (amendatory of How. Stat. § 7247), which provides that no judge can practice as an attorney in the *circuit* in which he has been elected, etc., was intended to remove any question which had formerly existed of the *right* of a circuit judge to practice at the bar of other circuits than his own; citing *People v. Evans*, 72 Mich. 367.

5. This Court is not disposed to encroach, except in a very plain case, upon the province of the trial judge, whose duty it is to see that the fair limits of argument are not passed, and that a proper decorum is preserved by counsel, as well as others who take part in judicial proceedings.

6. The following general propositions are summarized from the opinion of Mr. Justice CAHILL:

*a*—The managers of railroad companies are engaged in conducting for profit a business which at the best is hazardous to human life. In providing sound tools and safe appliances for the use of their employés, their plain legal duty, to say nothing of the dictates of humanity, requires great vigilance; nor can they be heard to excuse themselves from taking all reasonable care on the ground that care involves labor or expense; citing *Beauchamp v. Mining Co.*, 50 Mich. 103.

*b*—Railroad companies cannot be held responsible for hidden defects in tools or appliances, if they have used reasonable care in procuring them; but they are not absolved from the duty of testing or of inspection because they have bought in the open market of reputable dealers, or employed competent workmen to construct them. If any defect exists which a careful test or inspection would have discovered, the master must be held to have knowledge of such defect, and to be responsible for it.

Error to Alcona. (Simpson, J.) Argued May 13, 1890. Decided June 13, 1890.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*A. M. Henry (J. C. Shields,* of counsel), for appellant.

*Frank Emerick,* for plaintiff.

[The points of counsel are so fully stated, and the authorities bearing upon the main questions involved so fully reviewed, in the opinion, and in the cases cited in head-note 1, that a restatement from the briefs of counsel is omitted.—REPORTER.]

CAHILL, J. This action was brought by plaintiff, as administrator, to recover damages for the death of Thomas Harvey Morton, a former employé of the defendant. The plaintiff's intestate was on March 12, 1888, and for some time previous thereto had been, employed as a brakeman on one of the logging trains of defendant, running on a branch of its road, engaged principally in the carrying of long timber. On that day he was thrown, in some manner, from the train on which he was working, run over, and killed.

The plaintiff's case, as set up in the declaration, was that the intestate, while so employed upon one of the trains of the defendant, was required to set the brakes upon some of the cars; that, to set the brakes, he was required to turn the wheel at the top of the vertical shaft of the brake until the brake-chain at the bottom of the shaft, and connecting with the brakes upon the car-wheels, should draw and press the brakes upon the car-wheels with sufficient force to diminish or stop the speed of the train; that the brakeman's safety required that the brake-chain should be of sufficient size and strength of links, and that the links should be strongly and firmly welded together, so as to sustain a strong strain

upon the chain; that it was the duty of the defendant to furnish and provide chains of. sufficient size and strength, with the links so well and firmly welded together, as to sustain the amount of strain necessary to enable the intestate to perform his duties as brakeman without danger of such chains breaking while the brakes were being set, and thereby throwing him from the car, under the wheels.

That the defendant did not provide chains upon one of the cars of sufficient size or strength, or with the links properly welded together, so as to be safe, but provided a chain upon the brakes of one of the cars which was not of sufficient size or strength, and which did not have its links welded together, so as to be safe to use for the purpose required; and that on March 12, 1888, while the train on which intestate was employed was running between Mud Lake and Mud Lake Junction, the intestate was required to set the brake upon that car, and, while engaged in setting the brake, the chain, by reason of its not being of sufficient size or strength, and because some of the links had never been, and were not, welded together, broke and parted, and thus threw the intestate,. without any fault or carelessness on his part, from the car, and under the wheels, which ran over him, and caused his death.

The defendant pleaded the general issue. Upon the trial the defendant rested its case upon the testimony of the plaintiff, putting in no evidence, and requested the court to take the case from the jury, and direct a verdict for the defendant, upon three grounds:

1. That no negligence on the part of the defendant had been shown.

2. That the negligence, if any, on the part of defendant, was that of one Bischam, the car-inspector, and that Bischam was a co-employé of deceased.

3. That it appeared from the plaintiff's testimony that

the plaintiff's intestate was guilty of contributory negligence.

These requests were refused. The case was submitted to the jury, and a verdict rendered for plaintiff for $4,000. The defendant brings error.

We will consider these claims in their order. As the case went to the jury upon the plaintiff's testimony, the verdict must be sustained, if it appears that there was any legitimate evidence tending to establish the essential facts upon which his case depended. No one saw the deceased when he fell from the car. The manner and cause of his death are therefore to be inferred from other facts proven.

We take the following description of the cars and of the brake from the plaintiff's brief, the accuracy of which is not questioned:

"The cars consist of mere trucks, each of which made up of two sets of wheels and axles set in a strong frame, with no covering whatever on top except cross-timbers, called 'bunks,' and upon which the logs rest. Two of these cars of trucks are connected by a long reach, and the two cars not so connected are connected to the next cars by the long timber itself. In the construction of the brakes, there is at the bottom or lower portion of the vertical shaft or staff a spool into which the shaft fits. This spool is a round piece of iron about two inches in diameter, and three inches at the top, tapering. There are two brake-beams in between the two sets of wheels composing a truck, and to these are attached a bar or lever, which, when pulled, spreads the two brake-beams apart, and presses the shoe of the brake upon the wheels. The brake-chain is hooked into this lever or bar under the car, and then runs forward to the front frame of the truck, where it passes through a 'sheave,' and then turns a square angle to the spool at the outside of the car and bottom of the brake staff, where it passes through the spool, and is fastened by a bolt and nut. This sheave or pulley is made of two wheels or pulleys, through which the brake-chain runs."

The evidence touching the manner of intestate's death was given by the trainmen employed with him. Peter Rose testified that he was engaged in braking on the same train on March 12.

"The last time I saw Morton he was sitting down to set his brake. That was at the top of Pritchard's hill. We were required to set brakes at that point, because it is down grade, and a pretty steep hill. They shut off steam, and the train comes down the hill, sometimes pretty fast. It was at this point where I saw Morton setting his brake, the last time I saw him alive.

"The men, in setting the brakes, would sit down on top of the load of logs. We had to sit down to set the brakes. You take hold of the brake-staff, and turn the brake to set it. The staff has a cross-piece on it at the top, and the brakeman takes hold of the cross-piece, and sets it by turning it to the right. There is a dog at the bottom of the brake-shaft to hold it, and the brakeman has to put his foot down on the dog when he turns it. After I saw Morton, as I have stated, the next I noticed or learned about him was at Mud Lake Junction, about four miles further on, where we missed him. That same afternoon I was at the same point where he fell off, and saw blood and other spots on the road. This was near the point where I saw him set the brake, and towards the junction. I· noticed that the chain on the car that Morton was working at was broken, and that the link was parted.

"When a brakeman twists the chain so as to set the brake tightly, and there is a hard strain on the chain, if the chain should suddenly part, the effect would be to throw the brakeman off the load."

The body of Morton was found near the top of Pritchard's Hill, and taken on the engine to Black River, where an inquest was held upon it. Upon this evidence as to the manner and cause of Morton's death, the court left it to the jury to say what caused it, instructing them that, if the death was caused in any other manner than by his being thrown from the car· by the breaking of the brake-chain, the plaintiff could not recover. No question is made as to the propriety of this instruction.

The testimony of various witnesses called by the plaintiff showed that the brake-chain, when examined after the accident, showed that the link where the break occurred had never been properly welded, but had been left with what the witnesses called a "cold weld" or "cold shut;" that the surface of the iron where this cold weld was, was smooth, and showed no appearance of the break; that a piece of the link where it had separated and spread apart was broken off; that, in examining the chain, they discovered another link that had a similar weld; that is, just closed together tight, but not welded. The witnesses also testified that this defect in the chain could be easily discovered by a close examination of the chain by any one.

Daniel Campbell, who was employed by defendant in the supply department, testified that he had formerly been helping in the defendant's blacksmith shop at Black River. He further testified that he saw the broken chain, and described it to the jury.

"It was a cold weld. I am not much of a blacksmith, but I can tell whether a weld is good or not. It never was welded together, because it was smooth. You could see it was turned over all right for a weld, but it never was welded, and a piece broke off. There was a black spot in it, where there was a defect. I could not exactly tell, but a link or two from one end or the other was another cold weld. I could see that when I took it up in my hand, and looked at it."

On cross-examination the witness testified that he was acquainted with Mr. Bischam, who was in the employ of the railroad company; that he helped him a good deal. Bischam was the inspector of cars, and he fixed the cars. He inspected the cars that Morton was working on. It was his duty to look over the cars as they came in; to look at the chains and running material of the train; to see that everything was ready, and in proper shape, and,

if he found that anything was wrong, he had to repair it; if he found a defective brake-chain, to remove it from the car.   Mr. Bischam had been engaged in this duty for a good many years.   It was the duty of Mr. Bischam to examine each train of cars that came in loaded before it went out again.

" *Q.* You had no doubt, from looking at the chain, but what the links had been, before the accident, put down nicely and smoothly in place?

" *A.* They were laid down; but, if you examined closely, you could see that they were not welded.

" *Q.* You would have to look very closely for it?

" *A.* I could see they were not welded.

" *Q.* It would require a somewhat critical and close examination to see that?

" *A.* Yes; a man would have to look for it.

"*Q.* Do you know where this link that came apart,—where it was?   Whether it was the part near to the spool or at the other end of the chain?

" *A.* I should judge it was about where the pulley is, or the sheave, as near as I could judge.

" *Q.* Do you remember what size the chain was?

:' *A.* I know the chain was too big for the sheave.

" Mr. Bischam used to come into the shop, and lay the chains on the anvil, and he and I spoke about it often. I said, ' Bischam, it binds the wheels.'   *   *   *   I used to take a hammer, and strike it a blow on the anvil. *   *   *   It did not work around the sheave in the natural shape, and we would have to crush it in quite a bit to make it run around the pulley."

The evidence also tended to show that the particular chain which broke at the time of the accident had been put upon the car, at this shop by Mr. Bischam, who had charge of that kind of work; that, in doing so, he had replaced other chains which were thought to be too small. Daniel Campbell testified:

" They put on this heavier chain in place of some lighter ones, and Mr. Bischam used to say:  ' If they left the old chains on, they were better than the cold welds.' "

This evidence, it was claimed by the defendant, had no tendency to prove negligence on its part. It is said that the duty of the railroad company was fully performed when it procured chains in the usual and customary way, and when it employed a competent person to inspect its cars, to see that they were in good condition, before starting out on a trip; that Bischam was such a person; and that the defendant was not responsible for his negligence, if he was guilty of any, because he was a co-employé of Morton. In this position we cannot agree with defendant's counsel.

The rule may now be considered settled in this State, as well as in most of the states, not only that a master is bound to use all reasonable care in providing safe tools and appliances for the use of workmen in his employ, but that this is a duty which cannot be delegated to another so as to relieve him from personal responsibility. *Johnson v. Spear,* 76 Mich. 139; *VanDusen v. Letellier,* 78 Id. 492; *Brown v. Gilchrist,* 80 Id. 56.

The duty of the master to his employé in this respect is clearly and well stated by Mr. Justice MORSE in *Van Dusen v. Letellier,* just cited, at page 502:

"It is well settled by all the authorities that the master must provide his servant with a safe place to work in, and furnish him with suitable machinery and appliances with which to perform such work, and it is his duty to keep such machinery and appliances in good repair. If he cannot do this himself, personally, he must provide some other person to take his place in this respect; and the person to whom the master's duty is thus delegated— no matter what his rank or grade; no matter by what name he may be designated—cannot be a servant in the sense or under the rule applicable to injuries occasioned by fellow-servants. Such person is an agent, and the rules of law applicable to principal and agent must apply."

This doctrine is also clearly stated by Justice Field in *Railroad Co. v. Herbert,* 116 U. S. 650, where the whole

question is carefully discussed, and numerous authorities in New York, Massachusetts, Maine, and other states to the same effect discussed and approved. Four of the Judges dissented from his opinion upon the ground that the case was governed by a special statute in Dakota, but expressed no opinion as to the common-law liability of the defendant under the circumstances of that case.

In Shear. & R. Neg. (4th ed. §§ 194, 204), this question is discussed and stated as follows:

"SEC. 194. The master also personally owes to his servants the duty of using ordinary care and diligence to provide for their use in his service sound and safe materials, instruments, and accommodations, and such appliances as are reasonably calculated to insure their safety. He is also personally bound to inspect and examine all these things from time to time, and to use ordinary care and skill to discover and repair defects in them."

"SEC. 204. None of the duties which have been previously stated as devolving upon the master personally can be by him delegated to any agent so as to relieve him from personal responsibility. He may, and often must, delegate the performance of such duties to subordinates; but he remains responsible to all his servants for the acts of these subordinates in that particular capacity to the same extent as if those acts were literally his own."

The doctrine of the text is ably supported by the citation of authorities.

In no other department of business is there so much reason for applying this rule with strictness as in that of railroading. The managers of railroad companies are engaged in conducting for profit a business which at the best is hazardous to human life. In providing sound tools and safe appliances for the use of their employés, their plain legal duty, to say nothing of the dictates of humanity, requires great vigilance. They cannot be heard to excuse themselves from taking all reasonable care on the ground that care involves labor or expense. *Beau-*

*champ v. Mining Co.*, 50 Mich. 163. They cannot be held responsible for hidden defects in tools or appliances, if they have used reasonable care in procuring them; but they are not absolved from the duty of testing or inspection because they have bought in the open market of reputable dealers, or employed competent workmen to construct them. If any defect exists which a careful test or inspection would have discovered, the master must be held to have knowledge of such defect, and to be responsible for it.

It is urged that the railroad company has done all it can do when it buys of reputable dealers material and machinery for use by its employés; that it cannot, when buying, inspect personally every link of a chain to see whether it is properly welded. But it can do this personally as well as it can personally do any act involved in the operation of its road. It not only can, but its duty requires that it shall, before it is placed on a car, cause every link of every chain used by its employés in places or under circumstances involving danger, in case the chain should break, to be carefully tested and inspected by some one competent to judge of its fitness for the utmost strain that is likely to come upon it. If this duty had been performed in this case, the cold weld in the chain would very likely have been discovered, and the chain condemned as unfit for its intended use.

Defendant's counsel asked the court to charge the jury that it was essential to the plaintiff's recovery that he should allege and prove that the defendant had notice or knowledge of the defect complained of, or that it was guilty of negligence in not having such notice or knowledge, and that, having failed to either allege or prove such facts, the plaintiff could not recover. This the

court declined to do, and we think properly. As the case was left to the jury, there was no room for the application of the rule requiring notice. The court limited the jury, in determining the question of defendant's negligence, to one point, viz., whether the chain was reasonably safe when it was put on the car, and distinctly told them that, if they found it was then safe, the plaintiff could not recover; that the defendant's liability ceased when it provided a chain that was in the first instance reasonably safe. If he had left the jury to determine whether the chain had not become unsafe by time and wear, then the question of the defendant's notice or knowledge might have been important. But, as left to the jury, it was simply a question of defendant's care, or want of care, in testing and inspecting the chain before putting it on the car. In *Ford v. Railroad Co.*, 110 Mass. 240, the court held that a similar request was rightfully refused, and it was said (p. 261) that—

"The question was not whether the officer named knew, or might have known, of the defect, or of the incompetency of those who had charge of the repairs, but whether the corporation, in any part of its organization, by any of its agents, or for want of agents, failed to exercise due care to prevent injury to the plaintiff from defects in the instrument furnished for his use."

This doctrine is quoted with approval by Mr. Justice Field in *Railroad Co. v. Herbert, supra*. Upon the question of the defendant's negligence, we think there was ample evidence to warrant the submission of the case to the jury.

The discussion of this branch of the case also disposes of the second point made by the defendant's counsel, that, if the accident occurred through the negligence of defendant's agent, Bischam, defendant would not be liable therefor, as Bischam was a co-employé.

But it is said that, whatever may have been the negligence of the defendant, the plaintiff cannot recover, because the defect in the chain, if it existed, was immediately under the supervision of Morton, and should have been discovered by him; that the proofs show that it was his duty to examine the brake-chain every trip, before starting; that, if he had performed this duty, he must necessarily have discovered the defect, and, if he failed in such duty, he was guilty of negligence, and in either case the plaintiff could not recover. But the testimony did not necessarily make such a case as defendant's counsel state. It appeared that it was the duty of Morton to frequently examine and try the brake-chain, "to see if the brake-chain worked good,—if we could set our brake with it, tight." But it did not appear that the defective link was in sight, where the defect could have been discovered by Morton upon such examination as he was required to make. All the witnesses who testified on that point said that the cold weld, while plainly discoverable on close inspection, could not be seen under the car, or at a distance. The brakeman was, of course, bound to use great care himself. So far as the brake-chain was in sight so that he could examine it, he was bound to do so. His failure to notice visible defects would be his negligence, and not the company's. But he was not required to go under the car, and examine the chain link by link to see if it was in safe condition before he used it. He had a right to rely upon the defendant to properly test and inspect the chain before it was placed on the car for use. 1 Shear. & R. Neg. § 217, and cases cited.

Upon the question of Morton's contributory negligence the court charged the jury as follows:

"Now, then, there has been evidence introduced here, gentlemen of the jury, that it was part of the duty of:

this man Morton also to inspect the chain; that when he took his train from Black River, and went up for a load of logs with the empties, it was his duty to inspect the cars, and see if everything was all right. If you find from the evidence that it was part of his duty to inspect the chain on the car; that he was to inspect this chain, and see that it was safe, and properly upon this brake, —if you find from the evidence that was part of his duty,—then, gentlemen of the jury, it was his duty to see that the chain was properly safe; and, if he neglected that duty, he cannot recover, because no person can recover for an injury he suffered in this case by reason of the neglect to perform his duty, and, if the injury occurs from that neglect, it will be contributory negligence; and I will tell you right here, as a matter of law, if you find in this case anywhere, from the evidence, that the plaintiff in any manner contributed to the injury which he suffered by negligence of his own, he cannot recover."

This was as favorable to the defendant as was proper, under the circumstances of this case.

After the testimony was closed, and after counsel for plaintiff had made the opening argument to the jury, and counsel for defendant had been heard in reply, and Judge Kelley was preparing to make the closing argument for the plaintiff, counsel for defendant objected, for the reason that he was judge of the twenty-sixth judicial circuit, which is adjacent to the twenty-third judicial circuit, where the cause was being tried, and that the county of Alpena, where Judge Kelley resides, is adjacent to the county of Alcona, and for the reason that, at the last term of this court, Judge Kelley sat as the presiding judge. The objection was overruled, and exception was taken, and upon this ruling error is assigned.

We do not think this point was well taken. How. Stat. § 7247, prior to the amendment of 1889, read as follows:

"No judge can practice or act as a counselor, solicitor, or attorney in the court of which he is judge, except in

those suits in which he shall be a party, or in the subject-matter of which he shall be interested."

This statute was in the Revised Statutes of 1846 (section 20, c. 96), and has been continued in force ever since, without amendment, down to 1889. Under it, numerous circuit judges in the State have practiced at the bar of circuits other than their own; and their right to do so was never questioned in this Court, unless it may be said to have been in the case of *People v. Evans*, 72 Mich. 367. Whether in consequence of the criticism there made, or from some other reason, is not important; but in 1889 the section of the statute referred to was amended by Act No. 180, Laws of 1889, so as to read: "No judge can practice," etc., "in the *circuit* of which he has been elected judge," etc. Whatever we may think of the policy involved in this amendment, the evident purpose and effect of it was to remove whatever question may have formerly existed of the *right* of a circuit judge to practice at the bar of other circuits than his own. The statute as amended violates no provision of the Constitution, and we have no right, nor would it be becoming in us, to criticise or question the wisdom of a co-ordinate branch of the government in the exercise of its lawful discretion.

The remaining assignments of error relate to exceptions taken to alleged improper statements made by counsel for plaintiff in the course of their argument to the jury. We could, perhaps, find something to criticise in the conduct of counsel on both sides, if we were so disposed; but we should deem it invidious, on this record, to confine our criticism to counsel for plaintiff. Moreover, we are not disposed to encroach, except in a very plain case, upon the province of the trial judge, whose duty it is to see that the fair limits of argument are not passed, and that a proper decorum is preserved by counsel, as well

as others who take part in judicial proceedings. We do not discover anything in the conduct or argument of counsel for plaintiff on this trial that should be characterized as error by this Court. In reaching this conclusion, we are influenced somewhat by the fact that the argument for plaintiff appears to have been interrupted somewhat by counsel for defendant, and that some of the heat displayed, and intemperate language used, may have been induced thereby.

The judgment is affirmed, with costs.

The other Justices concurred.