C. H. Martin, Administrator of the Estate of William H. Bass, Deceased, Appellee, v. Des Moines Edison Light Co., Appellant.

**Negligence:** instruction. An instruction that negligence is "the
1 failure to do something which a reasonable person, guided by those considerations which ordinarily regulate the conduct of human affairs would do" is not open to the objection that it makes the conduct of a "reasonable man" rather than that of a "reasonably careful and prudent man" the standard of care.

**Master and servant:** safe place to work: instruction. An in-
2 struction that it is the duty of the master to furnish the servant a "reasonably safe place to work" is not open to the inference that the master is required to insure the absolute safety of the place, especially where the jury is told in the same connection that he is required to use the reasonable care and diligence in that regard of an ordinarily careful and prudent person.

**Safe place to work:** assumption of risk. The rules governing the
3 master's duty to furnish a safe place to work and the assumption of risk by the servant, are the same where the servant is engaged in the work of alteration or repair of machinery, as when operating the same in its complete form.

**Negligence:** instruction. The instruction in an action for the
4 death of a servant that the jury should consider "only the negligence charged in the petition . . . and then only such negligence, if any, as was the proximate cause of the death"

is not subject to the objection that the latter clause does not confine the jury to a consideration of the negligence set out in the petition.

**Assumption of risk:** BURDEN OF PROOF. A servant assumes the risks inhering in the nature of his employment and a plea by the master, in defense of an action for negligence, of the assumption of such risks amounts to no more than a denial of the charge of negligence, and an instruction placing upon the master the burden of proof on such an issue is erroneous; but the assumption of risks arising from the master's negligence, which are or ought to be known to a servant continuing in the employment, must be pleaded to be available as a defense, and on that issue the master has the burden.

**Expert evidence:** An expert witness may give his opinion as to the cause of a given result or condition, but not as to an ultimate fact which it is the province of the jury to determine.

**Master and servant:** DEGREE OF CARE. Reasonable care for the protection of servants employed about electrical appliances requires of the master a high degree of prudence and watchfulness for their safety.

*Appeal from Polk District Court.*— HON. JAMES HOWE, Judge.

THURSDAY, MARCH 8, 1906.

REHEARING DENIED, THURSDAY, OCTOBER 25, 1906.

ACTION at law to recover damages for the death of the plaintiff's intestate. There was a verdict and judgment for plaintiff, and the defendant appeals.—*Reversed.*

*Clark & McLaughlin* and *James B. Weaver, Jr.,* for appellant.

*Parrish, Dowell & Parrish* and *Spurrier, Mills & Perry,* for appellee.

WEAVER, J.— The defendant is a corporation engaged in the business of operating a system of electric lights in the city of Des Moines, Iowa, and at the time of the accident

of which complaint is made the intestate, William H. Bass, was a laborer in its employ. Among the furnishings of the plant was a device known as a switchboard to which several wires bearing the electric current centered. This switchboard was constructed of heavy marble slabs set upright in an iron frame, and rested upon the top of a brick wall built up for that purpose from the basement. To effect some contemplated change or improvement in the premises the company undertook to lift or raise the board about two inches. For this purpose a series of jackscrews was so adjusted below the board that, when operated together, the frame with the included slabs could be slowly and evenly raised to the desired position. To assist in this movement and to sustain the board in position, iron rods attached to the iron framework inclosing the marble slabs extended upward, passing through holes in a heavy beam or pole which had been suspended for that purpose from the steel truss supporting the roof of the building. The upper end of these rods were fitted with iron taps or burrs, and as the jackscrews below slowly pushed the switchboard upward these taps or burrs were screwed down, thus causing a portion of the weight to be suspended from the pole.

This work which we have attempted to describe was done very slowly and occupied several days in its accomplishment. The method and manner of it is described at great length and with technical nicety in the testimony of the witnesses and restated several times in the arguments of counsel, but the foregoing abridgment we think is sufficient to give a fair idea thereof.

To understand the nature of the alleged accident we must also refer, as briefly as possible, to the system of wiring by which in operating the light plant the current was brought to the switchboard. To attempt to go into the minute details would be confusing, rather than enlightening, to the non-expert reader. It is enough to say that the wires extended from the dynamo to the back of the switchboard,

where by means of various devices the current was controlled and switched or distributed to the several service wires. The safety of persons engaged in this employment required the insulating of the wires and the prevention of any contact between an electric wire and the iron frame inclosing the switchboard. When this was properly done, there was no danger of injury by electric shock to any one coming in contact with the switchboard or frame. If, however, by carelessness or otherwise, the iron frame became charged with electricity, it was a source of danger to those employed about it, and if, under such circumstances, a person standing upon or being in touch with any ground connection should also come into contact with the frame, the current would instantly pass off through his person to his injury and possible death.

The evidence tends to show that during a part of the time in which the board was being raised the connection with the power was suspended; but on the day in question, one current, known as the " alternating current," was turned on with a voltage of about two thousand three hundred. So far as appears, no notice of the turning on of the current was given to the workmen. Bass, the plaintiff's intestate, had at this time been in the employment of the company for several months assisting generally as a common or unskilled laborer in making such repairs as were required upon and about the building. He was not an electrician and had no duties to perform in relation to the management and control of the electric current, and so far as appears from the record had no experience or expert knowledge in reference to such matters. On the day in question it became his duty to attend to the turning of one of the iron taps or burrs at the upper end of the rods extending, as we have already described, from the iron frame of the switchboard through the pole or beam suspended from the trusswork of the roof. For this purpose he ascended a ladder, carrying in his hand a wrench with which he began to turn the burr.

While so engaged he reached up with his left hand and, evidently to assist in supporting himself on the ladder, took hold of an upright iron rod extending to the steel work supporting the roof. While in this position a peculiar sound attracted the attention of one Lynch, whose business it was to regulate the voltage, and looking up, he discovered Bass standing on the ladder stiff and rigid, with outstretched arms, and at once turned off the current, at which moment Bass fell to the floor dead. It is the theory of plaintiff that by the negligence of defendant the frame of the switchboard and with it the iron rods by which its weight was suspended from the pole had become charged with electricity, and that when Bass, with one hand, brought the wrench in contact with the upper end of the suspending rod and with the other grasped the roof iron, a circuit was completed for the discharge of the electric fluid. It may also here be said that experiments made soon after the death of Bass tended to show that the roof iron which he grasped in his left hand did have a ground connection, and that, if we assume the correctness of the claim that the iron frame was charged with electricity, the plaintiff's theory of the cause and manner of the accident is fairly maintainable.

The plaintiff's petition charges the defendant with negligence by which the death of his intestate was occasioned: (1) In turning on or having on the current of electricity while Bass was employed in a place of danger; (2) in failing to notify Bass that the current was on; (3) in ordering Bass to tighten the burrs while a dangerous current was on; (4) in failing to instruct Bass as to the dangerous character of the work; (5) in allowing the switchboard, frame, and rod to become charged with electricity; and (6) in failing to exercise proper care in the management and location of the wires and in insulating the same and in maintaining the insulation in proper repair, whereby the frame, rods, and bolts connected with the switchboard became charged with a dangerous current of electricity. The answer of the

defendant denies all the plaintiff's allegations of negligence and alleges the fact to be that Bass was familiar with the operation of the electric light plant "and had long known the risk incident to the employment in which he was engaged and assumed all the risks in connection with such employment." There was a verdict and judgment against defendant in the sum of $5,000. Many errors are alleged as grounds for the reversal of the judgment, and to these, so far as is necessary for the disposal of the case, we shall now give attention, though not entirely in the order in which counsel have here presented them.

I. The court defined negligence to the jury as "the want or omission of reasonable care and diligence, the failure to do something which a reasonable person, guided by those considerations which ordinarily regulate the conduct of human affairs, under the circumstances would do, or the doing of something which such person under such circumstances, would not do." This instruction is criticised as an incorrect statement of the law because, counsel say, it makes the conduct of a "reasonable man," rather than that of a "reasonably careful and prudent man," the standard of due care. We may assume the correctness of counsel's conception of the law in this respect without accepting their conclusion. It is true the definition given by the court does not include the words "careful" and "prudent"; but, as we read it, the very thought contended for on behalf of the appellant is none the less clearly expressed. If one acts as a reasonable person, guided by those considerations which ordinarily regulate human conduct, would act under similar circumstances, he comes as near furnishing an example of reasonable prudence and care as frail humanity is capable of. There was no error in the instructions in this respect.

1. NEGLIGENCE: instruction.

II. In paragraph 6 of the charge the jury were told that it was the "duty of the defendant to furnish the deceased a reasonably safe place to work." This is said to be

erroneous because, the employer is not required to insure his

2. MASTER AND SERVANT: safe place to work; instruction. employé an absolutely safe place to work, but simply that he will exercise reasonable care and skill so to do. If the charge as given was reasonably open to the inference that the master warrants or insures the absolute safety of the place where the servant works, it would, of course, be wrong; but such is not the case. In the same paragraph and in the same connection with the language criticised the court told the jury that the duty incumbent on the defendant was to .use the reasonable care and diligence which an ordinarily careful and prudent person would exercise under the circumstances. As men of average intelligence, the jury must have understood from the instructions that, if defendant exercised reasonable care under all the circumstances for the safety of its workmen, it had discharged its full duty. The statement of the duty of the employer to furnish his employé a safe place to work is justified by the language of text-writers and courts without number; but it is a universally recognized proposition that when the employer has used all reasonable care and diligence in this respect, his duty is done, and that a place which has been furnished and equipped with such reasonable care is a " safe place to work " within the meaning of the law. For instance, in *Fink v. Ice Co.*, 84 Iowa, 325, we quoted with approval from *Morton v. Railroad*, 81 Mich., 423 (46 N. W. 113); " It is well settled by all the authorities that the master must provide his servant a safe place to work in." In *Mosgrove v. Zimbleman*, 110 Iowa, 171, we said: " The mine owner was bound in the first instance to furnish a reasonably safe place to work and then to exercise ordinary care in so keeping it." In *Foley v. Packing Co.*, 119 Iowa, 246, we said: " That it is the rule of all the cases that the master must provide and maintain a safe place for his employés to work is well settled." The same rule in like or similar words has been announced in *Lewis v. Seifert*, 116 Pa. 628 (11 Atl. 514, 2 Am. St. Rep. 635); *Nadau v. Lum-*

*ber Co.,* 76 Wis. 120 (43 N. W. 1135, 20 Am. St. Rep. 29);
*Portance v. Lehigh C. Co.,* 101 Wis. 574 (77 N. W. 875, 70
Am. St. Rep. 932); *Prescott v. Engine Co.,* 176 Pa. 459
(35 Atl. 224, 53 Am. St. Rep. 683); *Elledge v. Railroad
Co.,* 100 Cal. 289 (34 Pac. 720, 38 Am. St. Rep. 290);
*Meier v. Morgan,* 82 Wis. 289 (52 N. W. 174, 33 Am. St.
Rep. 39); *Greenleaf v. Railroad,* 29 Iowa, 42; *Coombs v.
Cordage Co.,* 102 Mass. 572 (3 Am. Rep. 506); *Ill. Cent.
R. R. Co. v. Welch,* 52 Ill. 183 (4 Am. Rep. 593); *Ryan
v. Fowler,* 24 N. Y. 410 (82 Am. Dec. 315); *Kirkpatrick
v. Railroad,* 79 N. Y. 245; *Corcoran v. Halbrook,* 59 N. Y.
520 (17 Am. Rep. 369); *Railroad Co. v. Swett,* 45 Ill. 197
(92 Am. Dec. 206); and in other decisions too numerous
to mention.

The word " safe," as it is. here used, and indeed in
common parlance, does not mean a place so made and
guarded as to exclude all possibility of danger.   No amount
of care, prudence, and foresight can produce or insure such
a condition.   Many employments are in and of themselves
dangerous, and it involves no paradox to say that a place
of danger may be " safe " in the proper sense of the word.
It is " safe " when all the safeguards and precautions which
ordinary experience, prudence, and foresight would suggest
have been taken to prevent injury to the employé while he
is himself exercising reasonable care in the service which
he undertakes to perform.   Such a place is reasonably safe,
whether tested by the rule of law or by common sense, and
such was the effect of the instruction given by the trial
court.

But counsel say that Bass and his co-employés were en-
gaged in a work of alteration and repair of the building
and apparatus, and that " in such cases the employer is not
required to use reasonable skill and care as
in cases where the place or apparatus is com-
pleted and brought to perfection for the per-
formance of the service."   If we understand the proposition

3. SAFE PLACE TO
WORK: as-
sumption of
risk.

of counsel, it does not state the law. It is true that, if a servant is employed to make a dangerous place safe, he assumes the risk of the very danger which he undertakes to remove; for it is a danger which is naturally incident to his employment. So, too, if his work is of such nature as by its progress naturally creates a risk of injury, as if, for example, he is employed to tear down a building, or a toppling wall, or to excavate a gravel bank, and is thus exposed to danger from a fall of the overhanging material, this risk, for the same reason, imports no liability on the part of the master. If, therefore, in the present instance, the system of electric wiring or any other part of the apparatus connected with the transmission or control of the current had been known to be out of repair or dangerous of approach, and Bass, having knowledge that the wires were charged with electricity, had undertaken to make the changes or repairs necessary to remove the peril, the risk thus encountered would be his own. But the duty of the master not to expose the servant to any injury which may be reasonably anticipated and guarded against remains the same. As has been well said by the Supreme Court of Minnesota: " There is no difference, as to the duty of the master and the assumption of risk by the servant, between an employment to make repairs and any other employment. In all cases the servant is held to take on himself the risks necessarily incident to the employment, unless, perhaps, they be latent and known to the master, but not known to, nor by the use of proper diligence discoverable by, the servant; and in no case does he take on himself risks that arise by reason of neglect on part of the master, unless they be known to him or by the use of proper diligence are discoverable by him." *Madden v. Railroad Co.,* 32 Minn. 303 (20 N. W. 318).

Of course, if the nature of the repair be such that the danger of injury to the employé is enhanced, he will ordinarily be held to accept the enhanced risk, not because of any exception to the general rule, but because the essential

principle of the rule requires it. The enhanced danger is a natural incident to the thing he undertakes to do. It is one of the " circumstances " which surround and characterize the service, and which the jury is always directed to take into consideration in reaching a verdict in this class of cases. Bearing on this discussion see, also, *Engstrom v. Ashland, I. & S. Co.,* 87 Wis. 166 (5.8 N. W. 241); *McCauley v. Norcross,* 155 Mass. 584 (30 N. E. 464); *Breen v. Field,* 157 Mass. 277 (31 N. E. 1075); *Railroad Co. v. Redeker,* 67 Tex. 181 (2 S. W. 513); *Railroad Co. v. Hester,* 64 Tex. 401; *Railroad Co. v. Naylon,* 17 Colo. 501 (30 Pac. 249, 31 Am. St. Rep. 335); *Meloy v. Railroad Co.,* 77 Iowa, 743. It would be a most unreasonable rule, if the act of a servant in undertaking an unusually dangerous service for the master should relieve such master from all obligations to exercise reasonable care for the servant's safety. The servant may properly be held to the risk of the extraordinary danger which is naturally incident to the extraordinary service; but he never takes the risk of the master's negligence under any circumstances, save when he knows of such negligence or as a reasonably intelligent person ought to have known of it and chooses to remain in the service.

III. In the seventh paragraph of the charge the jury were told that in respect to the charge of negligence against the defendant they could consider ' 'only the negligence charged by the plaintiff in his petition. . . . and then only such negligence, if any, as was the proximate cause of the death of Bass." The correctness of this instruction is challenged, because, it is said, " the latter part of this instruction, when taken alone or as a part of the entire instruction, does not limit the jury to the alleged negligence set out in the petition, and if the jury inferred or concluded that the defendant was negligent in any respect which was the proximate cause of the death of the deceased, under this instruction it would be warranted in returning a verdict for the

**4. NEGLIGENCE:**
   **instruction.**

plaintiff." The latter part of the instruction should have been worded: "And then only such alleged negligence, if any, as was the proximate cause of the death of the deceased." We confess ourselves utterly unable to find the distinction sought to be made between the instruction as given and as counsel would have it amended: If the charge that defendant can be held liable only for such negligence as is alleged in the pleadings, and then for only such negligence as the jury may find to be the proximate cause of the injury, is not an explicit and sufficient direction that defendant must be held liable, if at all, for only such negligence as is alleged against it, and that, even as to the negligence so alleged, there is no liability unless the jury further find it to have been the proximate cause of the death of the deceased, it would be hard to devise a form of words to express the thought. It is rarely that any two lawyers choose precisely the same language in which to express the same rule or principle on which they are entirely agreed, and in our judgment the form of expression adopted by the court, and that which is preferred by counsel are mere verbal variations in expressing the same thought. The same thing may be said to the objections raised to paragraph 9 of the charge. There was no error in either.

IV. In the first paragraph of the charge the court told the jury that in order to recover damages the plaintiff must prove that defendant was negligent as charged; that the

5. ASSUMPTION OF RISK: burden of proof.

death of Bass was caused by such negligence; that Bass did not, by his own negligence, contribute to his injury; and that by reason of his death so negligently caused his estate had suffered damage, and that if each and all of these facts had been established a verdict should be returned in plaintiff's favor. This is said to be erroneous because of its omission to include any reference to the defendant's plea of an assumption of risk by the deceased, and in support of the objection we are cited to *Quinn v. Railroad Co.,* 107 Iowa, 710;

*Sankey v. Railroad Co.,* 118 Iowa, 39; and *Christy v. Railroad Co.,* 126 Iowa, 428. Were it not for the error in the tenth paragraph of the charge, to which reference is hereinafter made, this point could well be overruled. That instruction, as will be seen, recognizes or seems to recognize that a plea of assumption of risk is in the case, and that the burden of establishing it is on the defendant. If this were the situation (and the jury must be presumed to have so understood it), then the rule of the cases cited would apply. As a matter of fact, however, but for the effect of the tenth paragraph there would be no error in the first. The defendant's answer does not, in our judgment, raise the issue of assumption of risk. The very common use of this phrase with reference to two widely different legal propositions is doubtless responsible for the confusion here existing. When a servant enters the employment of a master, he is presumed to have taken into consideration such danger and exposure to injury as is naturally incident to or connected with such service, even when the master has exercised all reasonable care for his servant's safety. The risk thus arising, which involves no element of negligence on the part of the master, the servant takes upon himself and his wages are considered to be his full compensation for the danger thus incurred as well as for the actual labor of his hands. This so-called "assumption of risk" inheres in the contract of employment or in the relation of master and servant and need never be pleaded as a defense. A simple denial of the charge of negligence raises the question of this assumption sufficiently for all purposes of the case.

If the servant brings an action against his master, alleging negligence, and succeeds only in proving that the injury he has sustained was the result of some risk naturally incident to his employment, he fails to recover because he has failed to prove negligence. The very expression, "risks naturally incident to or inherent in the employment," exclude *ex vi termini* the idea of negligence; while " negli-

gence," as applied to the master, conveys with equal certainty the idea of a risk not incident to or inherent in the employment, but arising from the failure of the master to exercise the degree of care which the law requires of him for the safety of the servant. Now, generally speaking, the law never holds the servant to take upon himself the risk of injury from such failure of duty on the master's part; but to this proposition there is a well-recognized exception. While the servant, in entering upon and exercising the employment, may rightfully take it for granted that the master's duty with reference to his safety has been and will continue to be performed, yet if he knows that the master is in fact negligent in any respect, or if such negligence is so patent or obvious that as a person of ordinary capacity he ought to know it and to appreciate the danger therefrom, and with such knowledge he continues in the service without any promise on the part of the master to remedy or remove the defect, then he is said to have " assumed the risk " of the master's negligence and cannot recover for injury resulting to himself therefrom.

For instance, a railway engineer may act upon the theory that the engine upon which he is placed has been constructed and equipped with reasonable care for his safety; and if it is not, and by reason of any defect due to the company's negligence and without fault on his part, he receives an injury he may recover damages, but if while in charge of the engine he discovers in it defective conditions which he knows, or ought to know, expose him to danger and he elects to continue in such employment under such circumstances, he does so at his own peril, and injury therefrom gives him no right of action. It is this assumption of risk, constituting, as we have already said, an exception to the general rule, which affords an affirmative defense to an action by the servant for personal injury and to be available to the master must be affirmatively pleaded and proved. See Sankey v. Railroad Co., *supra*. The plea is to some extent

in the nature of a confession and avoidance. It says to the plaintiff, in substance: "Even if it be true that I was negligent, as you charge, you knew it before the injury of which you complain, and with knowledge of the danger you voluntarily remained in my service and thereby assumed the risk of injury." But such is not the matter or substance of the answer in this case. The clause or count relied upon by the appellant as representing the issue is in the following words: "Defendant further denies that the decedent was unacquainted with the operation of said electric light plant, and alleges the fact to be that he was familiar and acquainted therewith, and had long known the risk incident to the employment in which he was engaged, and assumed all the risks in connection with such employment." This, it will be readily observed, does no more than plead the assumption of the risk which inheres in the contract of hiring — the risk "incident to the employment"— and raises no question or issue which is not raised by a simple denial of the petition. For these reasons paragraph 1 of the court's charge to the jury, standing by itself, was not erroneous, and the statement of the material facts required to be shown by the plaintiff to entitle him to recover was sufficiently full and specific. In the tenth paragraph, however, the court charged the jury in the following words:

It is alleged by the defendant that the decedent, if killed by an electric current, was killed as a result of the risk assumed by him as an employé of the defendant. In this connection you are instructed, that the decedent, William H. Bass, by entering the employ of the defendant and engaging in the work in which he was engaged· at the time of his death, assumed the ordinary and usual risks and dangers incident to. such employment, which were known to him, or which could have become known to him by the exercise of reasonable care on his part. He is presumed to have had knowledge of those things and conditions which a man of ordinary skill and prudence, under the same or similar circumstances, exercising ordinary care for his own safety,

should have known.   It was the duty of the decedent to use the natural senses possessed by him to the same extent that a man of ordinary care and prudence would, under the same or similar circumstances, to discover existing dangers; and if the death of the said William H. Bass was due to an electric shock, received by him from a current of electricity, and such current of electricity was one of the ordinary risks and dangers incident to the said employment of the said William H. Bass, which was known to him, or could have become known to him by the exercise of reasonable care on his part, then plaintiff cannot recover, and your verdict will be for the defendant.   The burden of proof is upon the defendant to establish the defense, of assumption of risk by the decedent, by a preponderance of the evidence.

Omitting the last clause, this instruction could perhaps be harmonized with the views we have expressed; but when to the admittedly correct statement that the deceased is held to have " assumed the ordinary and usual risks and dangers incident to his employment," and that if his death was from a risk of that character his administrator cannot recover, it is immediately and without explanation added that " the burden of proof is upon defendant to establish the defense of assumption of risk by a preponderance of the evidence," we are confronted by a contradiction or inconsistency which could scarcely have failed to confuse and mislead the jury.   It would seem quite probable that by some oversight of the court in formulating the charge, or by some mistake in making up the record for this court, there has been dropped from between the body of this instruction as above quoted and the concluding sentence thereof a clause in which " assumption of risk " as applied to the defendant's alleged negligence was properly explained, and in connection with which omitted clause the concluding sentence would be a correct proposition of law.   We must take it, however, as it appears in the record, and in that form the final proposition clearly places upon the defendant the burden of establishing the assumption by the deceased of the risks ordinarily inci-

dent to the employment in which he was engaged, although in the preceding part of the same instruction the jury was properly told that deceased is held to have assumed such risks as a matter of law. The error in the instructions, in the form here presented, is clearly of a prejudicial character.

V. Several exceptions were taken by appellant to the rulings of the trial court on the admission of testimony. Upon the examination of the record we find but one instance where the rulling appears to be errone-

6. EXPERT EVIDENCE.

ous. It was the theory of the defendant that Bass was not killed by an electric shock, but died from heart disease or other natural cause. A witness on the stand was asked by plaintiff's counsel the following question: " You may state, Mr. Spry, from your knowledge of electrical laws, and from the machinery there, and from what you say, what is your opinion as to whether or not Bass received an electric shock before he fell ? " Defendant's objection to the competency of the testimony was overruled, and the witness answered, " My opinion is that he did." We think the objection to the question should have been sustained. It is an accepted rule that, while experts may testify as to what in their opinion may or may not have been the cause of a given result or condition, it is not permissible for them to give their opinion as to the ultimate fact which the jury is organized to determine. See *Sachra v. Town of Manilla,* 120 Iowa, 567, and cases there cited. It is the province of the ury alone to draw ultimate conclusions. *Largan v. Railroad,* 40 Cal. 272; *Perry v. Graham,* 18 Ala. 822; *Railroad v. Atteberry,* 43 Ill. App. 80; *Butler v. Railroad Co.,* 87 Iowa, 206; *Muldowney v. Railroad Co.,* 39 Iowa, 615; *Marcy v. Insurance Co.,* 11 La. Ann. 748; *Wilson v. Reedy,* 33 Minn. 503 (24 N. W. 191); *Briggs v. Railroad Co.,* 52 Minn. 36 (53 N. W. 1019); *Davis v. Fuller,* 12 Vt. 178 (36 Am. Dec. 334). It is not always easy to draw the line between that which is and that which is not admissible under this rule; but, in our judgment, the question

now under consideration required the witness to enter the domain of the jury and pass upon one of the ultimate propositions inhering in the verdict, and the answer should have been excluded.

VI. It is finally argued that the evidence is insufficient to support a verdict in favor of the plaintiff. To this we cannot agree; but, in view of a retrial of the case, it is proper that we refrain from a discussion of the fact features presented by the record. It is sufficient for us to say that the widely extended use of electric agencies is a development of very recent years, and the law has not yet become fully settled as to the duties, liabilities, rights, and remedies of parties in reference thereto. It seems, however, that so far as expressed there is substantial unity in the holding that where one undertakes to produce or deal in a power of such tremendous potency, so concealed from ordinary observation, so laden with death-dealing possibilities, and as yet but imperfectly understood and controlled, reasonable care for the protection of those who may rightfully come within the zone of danger requires at his hands a high degree of prudence and watchfulness proportioned to the magnitude and subtlety of the peril to be guarded against. *Barto v. Telephone Co.,* 126 Iowa, 244; *Scott v. Iowa Tel. Co.,* 126 Iowa, 527; *Herbert v. Lake Charles Co.,* 111 La. 522 (35 South. 731, 64 L. R. A. 101, 100 Am. St. Rep. 505); *Mitchell v. Raleigh El. Co.,* 129 N. C. 166 (39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735); *McLaughlin v. Louisville El. Co.,* 18 Ky. Law Rep. 693 (37 S. W. 851, 34 L. R. A. 812); Croswell on Electricity, section 234; *Brown v. Edison Co.,* 90 Md. 400 (45 Atl. 182, 46 L. R. A. 745, 78 Am. St. Rep. 442); Keasby on El. Wires, section 245; *City R. R. Co. v. Conery,* 61 Ark. 381 (33 S. W. 426, 31 L. R. A. 570, 54 Am. St. Rep. 262); *Cook v. Wilmington,* 9 Houst. (Del.) 306 (32 Atl. 643); *Ahern v. Oregon Tel. Co.,* 24 Or. 276 (33 Pac. 403, 35 Pac. 549, 22 L. R. A. 635);

7. MASTER AND
SERVANT:
degree of
care.

*Wolpers v. L. L. & P. Co.,* 86 N. Y. Supp. 845.    Under all ordinary circumstances the question whether this duty has been performed is for the jury.

For the reasons stated a new trial must be ordered.— *Reversed.*