SCOTT *v.* BOYNE CITY, GAYLORD & ALPENA RAILROAD CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—CAUSE OF ACCIDENT —EVIDENCE.

Upon the second trial of a negligence case, in which it was claimed that the manner of decedent's death was matter of conjecture, and that the jury should not have been permitted to guess or speculate as to the contention that decedent caught his foot in defective blocking in defendant's tracks, evidence not offered on the first trial and tending to prove that there was only one place in which decedent could have caught his foot near the point of the road where the accident took place, presented a question of fact for the jury. *Scott* v. *Railroad Co.,* 169 Mich. 265 (135 N. W. 110), distinguished.

2. SAME—QUESTION OF FACT—TRIAL.

When the circumstances disclosed by the evidence justify inferences that are sufficient to remove the cause of accident from the field of conjecture to that of probability, it should be left to the jury to draw the proper inference.

3. SAME—CONTRIBUTORY NEGLIGENCE.

And testimony that the deceased would have got on the train in safety if his foot had not caught in the blocking, and where there was no proof tending to show that his attention had been or ought to have been directed to the

faulty condition of the blocking, he was entitled to assume
that the defendant had performed its duty and had con-
formed to the requirements of law, and it could not be
held, as matter of law, that decedent was chargeable with
negligence.

4. EVIDENCE—MORTALITY TABLES—COMPUTATION.

Plaintiff's attorney was correctly permitted to testify to his
computations showing the probable earnings of deceased
during his expectancy, reduced to the present worth, where
the court fully and properly charged the jury relative
to the value of this testimony and their duty.

Error to Otsego; Sharpe, J.   Submitted June 3,
1914.   (Docket No. 12.)   Decided October 2, 1914.

Case by Samuel Scott, as administrator of the estate
of Frank Gibbs, deceased, against the Boyne City,
Gaylord & Alpena Railroad Company for the unlawful
killing of decedent.   Judgment for plaintiff.   Defend-
ant brings error.   Affirmed.

*Harris & Ruegsegger,* for appellant.

*De Foe, Hall & Converse,* for appellee.

KUHN, J.   A complete statement of the facts in this
case is found in the two opinions of this court when
the case was here before, reported in 169 Mich. 265
(135 N. W. 110).   Being sent back for a new trial, a
verdict and judgment thereon was again had for plain-
tiff, and the case is again brought here by writ of
error.   The assignments of error have been grouped,
and it is urged that the case should be again reversed
because:

(1) The exact cause of the accident was not proved,
and the jury were allowed to guess and speculate as
to it; (2) contributory negligence on the part of the
plaintiff's decedent; (3) errors committed before the
jury; and (4) refusal to grant a new trial.

It was the opinion of the majority of this court when

the case was here before that as to how and where
the injury occurred upon the record as made was a
matter of pure conjecture. It is the claim of plaintiff's
counsel that upon the retrial of the cause material
changes in the facts were shown. The claimed ma-
terial changes are set forth in their brief as follows:

"In this present record the exact place is shown
where Gibbs was standing at the time of his injury
to be at the north of the rails and about halfway be-
tween the switch and the block—if anything, closer to
the block. This is shown by Exhibit 1, the testi-
mony of Betterly, and also the testimony of defend-
ant's witness Frances Biskie. It also shows that the
distance between the throw rail of the split switch
and the main rail at the point of the switch when open
is 3½ inches, instead of 5½ inches, as therein stated,
and it narrows to 2½ inches in 3 feet from the end.
The speed of the train at the time of the injury is
shown to be 3 or 4 miles an hour, instead of 5 miles
miles, as stated in the opinion. We also call the court's
attention to the fact that the eyelets of the shoe (Ex-
hibit 4) show the strain on them. This is to be consid-
ered with reference to the other facts as to the condition
of the shoe, as it was found directly after the acci-
dent. It is also shown conclusively that there were no
places between the switch and the block where one's
foot could get caught and held, as it is shown that
Gibbs was, instead of there being 21 places, as indi-
cated in the former opinion."

The plaintiff rested his case before, and does now,
upon the claim that the decedent caught his foot at
the defective blocking. A reading of the opinion of Mr.
Justice MCALVAY shows that it was the opinion of the
majority of the court that, as it appeared from the
evidence, at about the place at which it was claimed
plaintiff's decedent stood there were 12 places, exclu-
sive of the defective blocking, into which his foot could
have been caught if he caught his foot at all, it was
just as probable that Gibbs' foot was caught in this

"gridiron of holes" as in the defective blocking, and that therefore the case should not have been submitted to a jury, as the verdict must necessarily rest upon conjecture or guess.

Upon the new trial testimony was introduced to show that it was impossible for Gibbs to have caught his foot in these places referred to in the former opinion. Mr. Van Auken, plaintiff's witness, testified in part as follows:

"I heard of Mr. Gibbs' death when I was at Vanderbilt. It was the 12th day of June, 1909. I drove there the same evening. I was at the place where he met his death first the next morning. That was Sunday. I made an examination of the surroundings. It was just east of the switch by the cooperage. I knew the street called Mill street here. It was west of Mill street—the first switch west of Mill street. Homer Scott was with me. I went down again in the afternoon. Mike Poquette was with me then, I think, and Mr. Betterly come over there. There were several around there. Homer Scott was back again at this time, I think. In the morning I was there half an hour to an hour, perhaps; in the afternoon about the same. I was there later. I think it was about a week's time after that when I went after the goods. Mr. Betterly and Mr. Scott, I believe, and another gentleman were with me. At subsequent times I was there; I could not tell how many times. The third time was about a week after. I was there on Sunday; I remember that; and I was there Monday morning, and afterwards before we came away. Sunday morning I was there first; then Sunday afternoon and Monday morning; then when I went over after the goods I was there again; and I was there about the middle of July, the same year—July 13th. Mr. Betterly was with me, and Mr. Devere Hall was with me there. I know Mr. Durfee. He was formerly sheriff of the county. I think he was there at the time I went over after the goods. From the first time I saw this switch and the ground around it, and the rails and those other things connected with the location, there was no change in it at all down to July 13th, that I could dis-

cover. I looked with that in mind. It was the same as on the Sunday following the death. On the 13th of July I took measurements that I made records of. Mr. Betterly was with me at my request.  *  *  *

"*Q*. Now, Mr. Van Auken, did you make any experiment to determine the places where the foot of one would be caught about the switch?

"*A*. Yes, sir.

"*Q*. How many different times did you do that?

"*A*. I could not tell you, so many of them.

"*Q*. Well, did you do it the first time you was there?

"*A*. I did.

"*Q*. And each time you was there?

"*A*. Yes, sir; I don't remember of ever being there but what I tried it, until the last time I was there—next to the last time I was there—then things were all changed.

"*Q*. What was the result of your experiments between the ties north of the rails from the switch east?

"*A*. There is no chance for a foot to be caught.

"*Q*. Well, did it catch?

"*A*. No, sir.

"*Q*. What was the result of your experiments inside of those two rails from the switch east?

"*A*. My foot would not catch there, did not.

"*Q*. Well, did it on any of those occasions?

"*A*. It did not.

"*Q*. Did you make any experiments with reference to the place were the point of the rail—the split rail—and the main track rail came together near the switch?

"*A*. I did.

"*Q*. Well, what did you do there?

"*A*. Foot wouldn't catch there.

"*Q*. That was where the space was $3\frac{1}{4}$ inches?

"*A*. That was at the point of the switch rail up to where it was so narrow that the foot would not go in.

"*Q*. Now, when you put the foot in there, what would be the result?

"*A*. Draw out.

"*Q*. What was the surface of the side of a split rail next to the main line rail?

"*A*. It was straight up and down as might be.

"*Q.* Was there any projections or bolts with heads on of any kind that interfered with your foot?

"*A.* No, sir.

"*Q.* Any overextension of the rail that interfered with your foot in any way?

"*A.* No, sir.

"*Q.* Did your foot catch in that place and hold it?

"*A.* No, sir.

"*Q.* At what other points did you make experiments?

"*A.* At the block.

"*Q.* Which part of the block?

"*A.* I would not be just positive as to that, but it seems now it was nearly one-half—about midway of the block; that is the way it seems now.

"*Q.* Well, you did at the block anyway?

"*A.* At the block several times.    *    *    *

"*Q.* Now, you say you tried to get your foot in the rails west of the blocking, did you?

"*Mr. Hall:* West of the blocking?

"*A.* Yes, sir; do you mean at the point of the switch?

"*Q.* I mean between the throw rails and the main rail west of the blocking?

"*A.* Yes, sir.

"*Q.* And you found no place there where you could get your foot in between the rails?

"*A.* I found no place where it would catch.

"*Q.* Well, now, when you mean 'catch' you mean by stepping on the rails that your foot did not catch there?

"*A.* It did not catch.

"*Q.* How did you step on those rails, lengthwise or crosswise?

"*A.* Lengthwise.

"*Q.* How many times did you do that?

"*A.* I could not tell you.

"*Q.* Jump on them quickly?

"*A.* Just as I would the other way.

"*Q.* At whose suggestion did you do that?

"*A.* At my own."

On being recalled he said:

"*Q.* In your experimenting, did I understand you

to say that you stepped your foot on the rails between the two rails, outside rail and the throw rail?.

"*A.* Yes, sir.

"*Q.* At what point along that rail?

"*A.* At the point.

"*Q.* And your heel would not go in at the point?

"*A.* Yes, sir.

"*Q.* How is that?

"*A.* Yes, sir.

"*Q.* Oh, it would?

"*A.* Yes, sir; my foot would go down.

"*Q.* Well, what other places did you try?

"*A.* Every place where there was a conceivable place to get one's foot caught there.

"*Q.* Now, then, you probably tried it the whole length of that throw rail, did you?

"*A.* No; I can't say that I did try it the full length of that throw rail, for part of the way there was no chance to get a foot fast at all?

"*Q.* Well, could you not get your foot in between the rails?

"*A.* No, sir.

"*Q.* The side of your foot, or heel, or anything, if they were 2 or 3 inches apart, you could, couldn't you; you could get your foot in, couldn't you, if they are 2 or 3 inches apart?

"*A.* No; not at the 2 inches apart and 2½.

"*Q.* Well, you could up next to the block pretty near to the end of the block; you could get your foot in there, couldn't you?

"*A.* I did.

"*Q.* Yes; you say the difference in distance between the west end of the block and the middle of this throw rail was hardly perceptible—the distance between the two rails?

"*A.* How is that?

"*Q.* I understand you to say that the difference in the distance between those two rails—the throw rail and the main rail—and the west end of the block, at the middle where this 2½ inches commences, was hardly perceptible?

"*A.* No, sir; you didn't understand me to say any such thing; I didn't say any such thing.     *     *     *

"*Q.* Mr. Van Auken, how long a space was there at the point of the switch between the rails where the foot would get in?

"*A.* Why, I should think about 3 feet, possibly.

"*Q.* And during that entire distance was there anything, any ball of the rail, the split rail, which held the foot?

"*A.* No, sir.

"*Q.* And what was the side of the split rail that entire distance?

"*A.* Perpendicular.

"*Q.* And was there any place that rivet heads or anything that interfered with the foot coming right out?

"*A.* No, sir.

"*Q.* Now, you were asked by counsel whether you measured the distance between the two rails at the west end of the blocking?

"*A.* Yes.

"*Q.* Just read what your second entry is on the book that you made.

"*A.* 'Width between rail west end of block 3¾ inches.'

"*Q.* Well, you did measure it, didn't you?

"*A.* Yes, sir; I did."

Homer Scott testified:

"I saw Mr. Van Auken make experiments with reference to the condition of the north rails and the track at the switch east of the switch with reference to the foot catching. He tried his foot on each side of the track, and he also tried it at the end of the block at the west end of the block, and it would catch at the west end of the block. It did not catch any other place. I saw him try it two or three times."

George Durfee testified:

"We were talking about it and the probabilities of his getting fast anywhere, and the only place that we could find that he could get a foot fast was over this blocking on the switch.

"*Q.* Well, did you try to find other places?

"*A.* We did; yes.

"*Q.* And what was the result when the foot was placed upon the west end of the blocking on the rails, at the west end of the blocking?

"*A.* Well, if you step in there and your foot slid ahead a little, you could not get it out."

No testimony was offered by the defendant to show that one's foot could have been caught and held at the places claimed. From the testimony of Betterly, the eyewitness, the jury could reasonably say that Gibbs was caught by the blocking and held until drawn under the train. He says he saw Gibbs take hold of the brake hanger beam, and then saw his body straighten out as if he was fast, and illustrated the situation to the jury.

It is our opinion from the record as now made, considering the evidence of Betterly as to the position of Gibbs, of Van Auken, and the others, as to the measurements and condition of the track, the evidence of the defective condition of the blocking, the marks on the foot, the condition of the shoe and its location after the injury, the place where the parts of the body lay, a reasonable and legitimate inference might be drawn that the injury was caused by the defective blocking, and when there are such circumstances shown as to justify inferences which bring liability within the realm of probability, the question of inference should be left to the jury. *Morton* v. *Railroad Co.*, 81 Mich. 423 (46 N. W. 111); *Knapp* v. *Railway Co.*, 114 Mich. 199 (72 N. W. 200); *Jones* v. *Railroad Co.*, 127 Mich. 198 (86 N. W. 838); *Little* v. *Bousfield & Co.*, 154 Mich. 369 (117 N. W. 903); *Parker* v. *Union Station Ass'n*, 155 Mich. 72 (118 N. W. 733).

It cannot be said that Gibbs, in entering between the cars at the place he did, was guilty of contributory negligence as a matter of law. It is a fair inference from the testimony that he would have gotten onto the train safely had not his foot caught in the

defective block. There was no evidence to show that his attention had been directed to the condition of the block, or that its condition was such as to necessarily draw his attention during the time he waited for the return of the train. Moreover, he had a right to assume that the defendant had complied with the requirements of the statute and had performed its duty. There was testimony to show that the place selected by Gibbs to mount the train was the usual place, and that the manner and method pursued by him were usual and habitual. The question of contributory negligence was a question of fact, and properly submitted to the jury.

Error is assigned because the court allowed the plaintiff's attorney to testify as to certain computations to show the earnings of Mr. Gibbs during his expectancy of life, which Mrs. Gibbs claims she was deprived of, computed at their present worth. This was not error, as the trial court properly instructed the jury with reference thereto, as to the value of this testimony and their duty. *Sonsmith* v. *Railroad Co.,* 173 Mich. 57 (138 N. W. 347).

We are of the opinion that this case was submitted to the jury with proper instructions, and that there is sufficient evidence in the record to sustain their verdict.

Finding no prejudicial error in the record, the judgment is affirmed.

MCALVAY, C. J., and BROOKE, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.