BELLE ARNOLD, Administratrix, Appellee, v. DOUGLAS & COMPANY, Appellant.

**MASTER AND SERVANT: Place for Work—Master Acquiescing in Abandonment of Safe Way—Effect.** A master who has provided a convenient, adequate and safe way for his employees to cross dangerous portions of his premises, and then acquiesces in what amounts, practically, to an entire disregard by his employees of the use of such provided way, will not be heard to say that he has performed his full magisterial duty to care for the safety of his employees.

> PRINCIPLE APPLIED: A set of factory buildings were located along both sides of three intervening switch tracks used in the operation of the plant. Workmen, in large numbers, were required daily to pass back and ·forth between the buildings. The master built a tunnel under the tracks, thereby connecting the buildings. Danger signs were erected· at the openings into the tunnel, directing the workmen to use the tunnel instead of crossing the tracks. But employees generally, without objection from those in authority, and the officers, superintendents and foremen, continued to cross over the tracks instead of going through the tunnel, which was not, at all times, well drained and was not, at times, the shortest route. Superintendents, at times, even ordered cars uncoupled and separated, in order to afford passage over the tracks. This .practice continued for some two years after the tunnel was built, and until deceased was caught between two cars and killed. *Held,* (a) the act in providing the tunnel and posting the notices was not of itself a full discharge of the master's duty, and (b) the master was under obligation to see that the cars were operated with reasonable regard for the safety of the workmen.

**MASTER AND SERVANT: Rules—Duty to Promulgate—Independent Workmen—Dangerous Acts.** When a business is conducted by

many servants, performing work independently of each other, and the work of one becomes periodically dangerous to another, it is the duty of the master to promulgate rules and regulations for the giving of warnings to persons likely to be endangered when such dangerous acts are about to be performed.

PRINCIPLE APPLIED: A set of factory buildings were located along both sides of three intervening switch tracks operated by the master. From 6 to 60 carloads of freight were handled in the yards each day. In the ordinary work of the yards, cars were moved by means of a crane, or by pinch bars, or by knocking one car against another. Numerous workmen daily passed back and forth over these tracks in the course of their work, passage between cars being afforded, at times, by uncoupling and separating the cars. Deceased, employed in one of the buildings, had occasion, in the course of his work, to pass over the tracks and between the ends of two cars. Without warning, they were knocked together and deceased was killed. The master had promulgated no rules for signalling the movements of cars nor provided for the service of guards at openings between the cars. *Held*, the negligence of the master was a question for the jury. (In Division II, the duty to promulgate rules is, in effect, held to be mandatory.)

**MASTER AND SERVANT:** Place for Work—Master Acquiescing In 1, 3 Abandonment of Safe Way—Effect.

**MASTER AND SERVANT:** Safe Place for Work—''Reasonable Care 4 to Provide Safe Place''—''Reasonably Safe Place.'' The terms or expressions, ''duty to exercise reasonable care to provide a safe place,'' and ''duty to provide a reasonably safe place,'' are identical in meaning and legal effect.

**MASTER AND SERVANT:** Actions—Instructions—Contributory 5 Negligence—Servant Using Less Safe of Two Routes. Whether a servant was guilty of contributory negligence in taking the less safe of two routes across railway tracks would depend materially on whether the safer route was then free and unobstructed.

**NEGLIGENCE:** Contributory Negligence—Contributory Per Se— 6 Facts Not Constituting. The court cannot hold that an injured party was guilty of contributory negligence as a matter of law, unless his conduct was so clearly reckless or imprudent as to leave no room for difference of opinion in the minds of impartial jurors.

PRINCIPLE APPLIED: Factory buildings were separated by three switch tracks, much used in the operation of the plant. Numerous workmen were daily required to pass back and forth

between these buildings. The master built a tunnel under the tracks and warned workmen to go *through* the tunnel and not *over* the tracks; but, for two years, all employees practically ignored the use of the tunnel and continued to pass over the tracks without objection from the master. The tunnel was not always well drained and not always the shortest route between the buildings. Superintendents, at times, ordered cars uncoupled and separated, in order to afford passage for the workmen. Deceased, though formerly employed at the plant, had worked only two or three days in one of the buildings. A machine broke. He was sent on an urgent errand to the millwright, who was on the farther side of the tracks. He started hurriedly across the tracks, taking the shortest route and the course usually followed by other workmen. In the direct line of his course, he came to two slightly separated cars on the farther track and passed between them just as they were, without warning, knocked together, and he was killed. Within a few seconds after being hit, he said: "They shoved the cars down and never hollered." Whether he saw or could have seen the men handling the cars did not appear. The cars were not handled by an engine. There was no eyewitness. *Held*, the question of contributory negligence was for the jury.

NEGLIGENCE: "No Eyewitness Rule"—When Rule Applies. The fact that a living witness may have seen the deceased at a point of time howsoever close to the point of time of injury, does not exclude the presumption of due care under the "no eyewitness rule," if there was opportunity for the deceased, when not in the view of the witness, to perform such acts of watchfulness or caution as reasonable care required at his hands.

APPEAL AND ERROR: Review—Custom and Practice of Trial Court—Determination of Lower Court Conclusive. A finding by the lower court as to the existence or nonexistence of a certain alleged custom or practice in such court, when supported by some evidence, is conclusive on the appellate court. So held in regard to a claimed custom under which the reporter entered exceptions to rulings of the court, without such exceptions' being audibly made by the counsel.

APPEAL AND ERROR: Exceptions—Conduct of Counsel in Argument—Acquiescing in Action of Court. He who objects to the conduct of counsel in the matter of argument to the jury, and thereby induces the court to admonish and caution the offending counsel, or to otherwise rule to such extent as the court may then deem fit and proper, will be presumed fully satisfied with the action of the court, *in the absence of a request for some other and more specific action.*

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

WEDNESDAY, JANUARY 12, 1916.

PETITION FOR REHEARING DENIED WEDNESDAY, JUNE 28, 1916,
BECAUSE NOT FILED IN TIME.

ACTION at law to recover damages for the plaintiff's intestate. There was a verdict for plaintiff, and defendant appeals.—*Affirmed.*

*Luberger & Lenihan; Deacon, Good, Sargent & Spangler; C. E. Wheeler,* for appellant.

*Rickel & Dennis,* for appellee.

WEAVER, J.—The defendant, Douglas & Company, operates a factory in the city of Cedar Rapids, Iowa, for the production of starch and feed and the various by-products of such manufacture. The plant occupies a large number of buildings ranged on either side of three switch tracks. Of these three tracks, the one upon the west is known as the grain track, over which grain is shipped into the factory and finished products are shipped out. Next in order to the east is the crane track, where loading and unloading are done by the use of a crane. The third is the coal track, over which fuel is taken in and cinders are hauled out. In the course of their employment, the defendant's workmen, or many of them, were required to go back and forth between the buildings standing on opposite sides of these tracks. In the year 1911, the defendant constructed a tunnel or subway under the three tracks, connecting the buildings on the east and west sides thereof. Whether this was provided as a matter of safety to the employes in making the crossing, or as a time-saving convenience when the tracks were blocked by standing trains or cars, is a matter of some contention in argument; and under the evidence, either or both conclusions are possible. At or near the entrance at either end of the tunnel were posted signs or notices in conspicuous lettering: "Use the tunnel

instead of crossing the tracks. Avoid any danger." On August 14, 1913, the intestate, J. L. Arnold, then and there in the defendant's employ, undertook to cross the tracks from west to east, but, instead of using the tunnel, he started across the open yard. On the east track were standing freight cars, and, as he attempted to pass through an opening between them where they were uncoupled, they were moved or brought together, crushing him in a manner to cause his death. This action is brought by the administratrix of Arnold's estate to recover damages, on the grounds that his injury and death were caused by. the defendant's negligence, as follows: (1) That, knowing that it was the usage and custom of its employes to cross the tracks at that place, which custom had been acquiesced in and consented to by itself, defendant negligently allowed the car to strike the deceased without giving him any warning, and negligently set the car in motion without ascertaining whether its employes or any of them were then using the crossing; (2) that defendant negligently failed to provide rules for the movement. of its cars or for signals to give warning of such movements in the interest of the safety of its employes; and (3) that defendant was negligent in permitting the car which struck the deceased to be propelled along the track at a high and dangerous rate of speed, when it knew that its employes were, according to their custom, using the crossing at that point. The allegations of the petition are denied generally. There was trial to a jury, resulting in a verdict and judgment for plaintiff in the sum of $7,500.

I. The first assignment of error goes directly to the question whether there was any evidence upon which the jury could properly find the defendant chargeable with negligence.

1. MASTER AND SERVANT: place for work: master acquiescing in abandonment of safe way: effect.

It is argued that a safe way of crossing through the tunnel had been provided for the deceased and other employes; that warning and direction had been given them not to cross over the tracks, but to make use of the

tunnel under the tracks; that the danger was entirely obvious to the deceased, and there was no duty upon defendant to warn him of that which must have been as well known to him as to the defendant; and that there is no testimony indicating in any degree a failure of the defendant to use reasonable care for the safety of deceased. But in making this point, defendant ignores much other pertinent matter of which there was evidence for the jury's consideration. Indeed, it was clearly proved that, notwithstanding the existence of the tunnel, not only the employes generally,—men, boys, women and girls,—but officers, superintendents and foremen as well, having occasion to go from one side of the premises to the other, almost universally crossed over the tracks instead of under them, and the general effect of the testimony is that this was done without protest or objection on the part of those in authority. The jury would also have been justified in finding that the tunnel was at times more or less flooded during wet weather; that at times the contents of a sewer leaked into it. In many instances, the way through the tunnel was longer and less convenient, and it is shown that one or more of the superintendents on different occasions ordered the men leaving cars on the tracks to uncouple and separate them, to afford passage from one side to the other through the yard. Indeed, on the very day of the accident, one of the superintendents, finding the way across the tracks blocked by an unbroken train of cars, and being thereby compelled to use the tunnel, became quite angry with those responsible for the situation, and gave orders against its repetition. The timekeeper's office was on the east side of the track, and workmen on the west side necessarily had to cross the yard over or under the tracks at the close of each day; and in the performance of their various daily duties, employes were frequently passing in either direction. That this custom was known to and acquiesced and shared in by the defendant and its officers and foremen can hardly be doubted.

Upon such a record, it would have been error for the trial court to say as a matter of law that the defendant's act in providing the tunnel and posting notices was, of itself, a full discharge of its magisterial duty to care for the safety of its employes. For if, by consent or acquiescence of the defendant, the crossing through the yard was being employed from day to day by the workmen going to and coming from their place of labor, and in transacting the various duties in which they were employed about the premises, then it was its duty to see that the movement of cars through the area thus occupied and used was conducted with reasonable regard for the safety of those thus crossing the tracks. Under such circumstances, an employe crossing the tracks in the course of his employment is not a trespasser nor a mere licensee; he is the master's servant; and the yard for the time being is his place of work, and he is entitled to reasonable protection therein.

If we understand the record correctly, the cars brought in on the coal track where deceased was struck were not handled or moved about by an ordinary locomotive, but power from the crane was applied to set the cars in motion where the grade was such as to require it, and where such assistance was not required, they were started down grade by the use of a pinch bar, their descent being controlled, if need be, by a brake. On the day in question, deceased was employed in what is known as the feed house, on the west side of the yard, when, a piece of machinery needing some repair, the boss or foreman at that point sent him to the master mechanic for an order on the millwright to obtain the necessary material. Having obtained the order, he started somewhat hurriedly for the millwright's office, taking the nearest and most direct way over the tracks. Reaching the coal track, he stepped into the opening between the two uncoupled cars, when the opening was suddenly closed upon him by the stroke

2. MASTER AND SERVANT: rules: duty to promulgate: independent workmen: dangerous acts.

or impact of cars sent down the grade in the manner above described. Of the movement resulting in this disaster, the man in charge thereof testifies·

"There were no signals given before starting the cars. The cars were about three car lengths apart when they started them, that is, before they started the other cars down. The cars that were started were about two car lengths from an empty car which we had just got through unloading, which was about at the tunnel, that is, the end of it, and we had to hit it hard enough to knock it on down out of our road. The only way we had to get cars out of the road was by kicking cars into them. I don't know as there was any cars down north of the empty. I know there was a car at the cinder chute when we went to work in the morning, about half full. We dropped it down so we could drop a load of coal down to empty it. There was an empty around the tunnel and in the vicinity of bins 1 and 2 that we had to kick off of the road that day. Beyond north of that empty, was a cinder car half full of cinders. The first car that we had to kick out of the way, I think, was the cinder car. We started it down and it reached the first one and then moved the car of coal down and unloaded that. We had that unloaded and then I went to bring them other cars down so I could handle them, and in order to do it I had to move all of them at once, because we couldn't reach the other one with the crane. The cinder car was in front of the engine room, way down below the tunnel, and the empty was the first one that the two cars collided with, and the space, I suppose, through which Arnold was passing was through the cinder car down in front of the engine room and the empty. He was injured between the empty and the cinder car, just a little north of the tunnel. No man had been placed by that opening before the cars were started that day."

From 6 to 60 carloads of freight were moved into and out of the yard every day, and there was more or less work every day in setting or "spotting" cars for convenience in

loading or unloading.   The evidence tends to show that there
was no rule or order established by defendant for· signaling
the movement of cars, or for the service of a watchman or
guard at the openings between cars through which the
employes were accustomed to pass in crossing the yard, and
we think it was a fair question for the jury whether, under
these circumstances, reasonable care did not require the
defendant to use some other precaution than appears to have
been employed to guard against injuries of this nature to its
servants rightfully crossing the tracks.

II.   Error is further assigned upon the giving of the
fifth paragraph of the court's instructions, with reference to
the effect of a general custom of the defendant's employes to
avoid the use of the tunnel and to cross over
the tracks in moving from one part of the
factory premises to another.   It is said that
the court, in substance, told the jury:

3. MASTER AND
SERVANT: place
for work: mas-
ter acquiescing
in abandonment
of safe way:
effect.

"That all they had to do in order to hold
the defendant negligent was to find that there was a custom
to use the tracks instead of the tunnel."

But the court used no such ̇language in tenor or effect,
and the meaning which appellant reads therein is not to be
fairly extracted from the instruction.   What the court did
say, after referring to the fact that the tunnel had been con-
structed, was that the plaintiff seeks to avoid the effect of
such fact by showing that defendant had waived its right to
insist that deceased was in duty bound to use the tunnel, by
consenting to and acquiescing in the general custom of its
employes to make their way from one part of the premises to
the other over and across ̍ the tracks.   The court then said to
the jury, in substance, that, if such fact had been shown, and
defendant had acquiesced in a general custom of its employes
to cross the tracks in their trips between different parts of
the plant, then it was the duty of the defendant to make
proper orders or establish proper rules governing the move-
ment of cars to avoid injury therefrom to employes so engaged.

And this we think is a fair statement of the law applicable to such situation.

III.   The instructions are further criticized as stating to the jury that defendant was an insurer of the safety of the place of work where deceased was employed.   What the court did say was that it was the duty of the employer "to take reasonable care that its employes had a safe place in which to work and to use all reasonable methods to guard against danger."   The point made against the instruction is that the duty to use reasonable care to provide the servant a safe place to work is not equivalent to an instruction that the employer is required to provide the servant a reasonably safe place to work.   This is, at most, a mere play upon words.   Answering the same criticism, we have on numerous occasions held that the two expressions are identical in meaning and legal effect, and that, when the employer has used reasonable care to make the place "safe," then it is "reasonably safe," within the meaning of the law of negligence.   *Martin v. Des Moines Edison Light Co.*, 131 Iowa 724, 730; *Brusseau v. Lower Brick Co.*, 133 Iowa 245, 248; *Witt v. Town of Latimer*, 139 Iowa 273, 279.   The instruction criticized in this case is fairly within the rule, even as the appellant states it.

IV.   In another instruction, bearing upon the question of contributory negligence, after stating the general rule requiring the defendant to use reasonable care in providing its employes a safe place to work and to protect them from danger when crossing the tracks in the line of their duties, the court said:

"If you find the defendants did make such provisions by building the tunnel, and placing notices at and near both mouths of it warning people to take the tunnel and avoid danger, and that such method of crossing the tracks was adequate to avoid the danger caused from moving cars, and not waived, and that it

*Marginal notes:*

4. MASTER AND SERVANT: safe place for work: "reasonable care to provide safe place:" "reasonably safe place."

5. MASTER AND SERVANT: actions: instructions: contributory negligence: servant using less safe of two routes.

was in full force on August 14, 1913, and the deceased knew
of it, or in the exercise of reasonable observation could have
known of it, and when he started to the millwright's office or
shop, there was no pressing necessity or occasion for him to
go in any other way, but he did take the more dangerous
course of crossing the tracks and was injured in doing so,
then there can be no recovery in this action, whether the
defendant was negligent in not having rules for the persons
moving the cars or not.''

· Objection is made to this instruction on the theory that
thereby the jury were given to understand that ''if only one
or two out of hundreds of employes of the defendant used
the tracks instead of the tunnel, that fact would establish the
custom and prove the defendant negligent.'' It must be
admitted that the particular sentence referred to, ''and that
it was in full force on August 14, 1913,'' is somewhat obscure;
but such meaning as counsel place upon it is not fairly to be
drawn therefrom. The court was not here discussing the
question of custom at all. Read in the light of the testimony,
which tends to show that the tunnel was at times impassable
or difficult of passage because of its being flooded or other-
wise unfit for use, we think that the jurors must have under-
stood that, in determining whether it was the duty of the
deceased to take the course through the tunnel, they should
give proper consideration to whether such course was on that
date free and unobstructed. Thus interpreted, the instruc-
tion is not open to the criticism made upon it.

· V. Appellant further insists that deceased was guilty
of contributory negligence as a matter of law. To so hold,
the court must find that, giving to the evidence its most

favorable construction in plaintiff's favor, it
**6. Negligence:**
**contributory**
**negligence: con-**
**tributory** *per*
*se*: **facts not**
**constituting.**
was still the duty of the deceased to go
through the tunnel instead of over the tracks;
or that, if he was not conclusively chargeable
with contributory negligence in taking such
course, he was negligent in attempting to go through the open-

ing between the cars without first knowing that he could do so with safety. We are not prepared to affirm either proposition. He was, of course, bound to know that a crossing over a railway track where cars are frequently moving is a place of danger and to adjust his conduct with reference thereto. But in crossing the yard, he was in the pursuit of his employer's business, and if, as we have already said, he took the course generally taken by the great body of the employes with the knowledge and consent of the defendant, and the course taken by the officers, foremen and others immediately representing the defendant, then he was not a trespasser, and the question whether he exercised reasonable care in choosing the route over the tracks instead of through the tunnel was for the jury, even though he chose the more dangerous one. The propriety and justice of this holding are the more obvious when we recall the circumstances under which deceased crossed the tracks. Though he had formerly been employed by the defendant, he had been working in the feed mill but two or three days when he was killed. The witness who was in charge of the mill testifies that on this day there was a break in what he calls the "thresher," causing the feed to be thrown out on the floor. Deceased notified witness of the break and was told by him to go to the millwright. Going to the millwright, the latter refused to attend to the matter without an order from the master mechanic. Reporting this to the foreman, he was sent for the required order, which the foreman approved, and he started again for the office of the millwright. Very quickly after he started out on this errand, the foreman heard the alarm, and, going to the place, found deceased in an injured condition, but still alive. Witness asked how it happened, and he said, "They shoved the cars down and never hollered." The foreman testifies that the errand of the deceased was one which required haste, and that his orders were to "have everything fixed right away." Another witness, who saw him on the way to the point where he was struck, says that he was walking fast and was "taking the shortest way," and this way,

as we have before said, was the way generally pursued by practically all persons employed on and about the premises. It certainly cannot be said that this act of the deceased was so clearly reckless or imprudent as to leave no room for difference of opinion in the minds of impartial jurors.

For even more apparent reasons, it cannot be said that deceased was conclusively guilty of contributory negligence in attempting to pass between the cars. The cars were uncoupled and stood apart a sufficient distance to enable him to go through. There is evidence, as we have seen, that standing cars were often thus separated for the express purpose of affording passage to those having occasion to cross the tracks, and that on some occasions the men responsible therefor were rebuked for failing to so open the way. This opening led apparently in the direct line of the way from the feed mill across to the office or shop which he was trying to reach in the performance of the duty with which he was charged, and we cannot say that he was not justified in assuming that the passage had been opened to enable him and others to make their way across, and that it would not be suddenly closed upon him without warning. There is no evidence that he saw or could see the men who were handling the cars farther up the slope, or that he had any reason to anticipate the particular movement by which he was crushed. He must, of course, be held to have known that the place was one of danger, and he was charged with the duty of exercising the caution of a man of ordinary prudence in threading a way which was thus beset; but it is not for the court to say what particular act or acts were required at his hands for that purpose. There is no direct evidence that he did in fact omit any reasonable precaution. His statement at the time, that they let the cars down on him ''without hollering,'' indicates that he was placing some reliance on a warning or signal preceding the movement of the cars, and, while this would not excuse him from exercising his own senses to discover and avoid peril, it is one

of the circumstances to be considered in determining whether
he acted with ordinary care under all the conditions which
surrounded him.  This, too, was for the jury, and the court
did not err in so ruling.

Moreover, there were no eyewitnesses of the accident.  It
is true that one witness swears that she saw him going in the
direction of the opening; but as he neared the cars, he was
hidden from her view.  Her statement is:

**7. NEGLIGENCE:**
**"no eyewitness**
**rule:" when**
**rule applies.**
"When I saw Mr. Arnold, he was going
towards that opening.  I saw him as he got
to the cars.  That was the last.  Just as he
got to the cars I couldn't see him any more,—the cars were
higher than he was.  When he got close to the cars he was
hidden back of them so I couldn't see him.  Just after I saw
him there as he approached the opening between those cars
the cars bumped, and just then I heard someone holler."

In another place, she says that she heard the cry "almost
instantly" after deceased was hidden from her view.  On
cross-examination, she testified, in effect, that her last view
of the deceased was when he was crossing the middle track,
apparently headed for the opening in the cars on the east
track, and that from that moment she had no knowledge what
he did or whether he did or did not look up and down the
track.  This testimony is, in our judgment, insufficient to
exclude the presumption of due care which arises when there
is no evidence of what the deceased did or failed to do in the
discharge of his duty to exercise reasonable care for his own
safety.  The fact that a living witness may have seen the
deceased at some point of his approach to the crossing does
not exclude the presumption, if there was opportunity when
not in the witness's view for him to perform such acts of
watchfulness or caution as reasonable care required at his
hands.  *Gray v. Chicago, R. I. & P. R. Co.*, 160 Iowa 1, 15.

VI.  Counsel for appellant have devoted a division of
their brief to what they denominate "Unclassified Errors
Relied upon for Reversal."  An examination of the points so

urged demonstrates that they are necessarily controlled and governed by the conclusions we have already announced, and require no further statement or discussion.

VII.   Finally, complaint is made that, by reason of the misconduct of plaintiff's counsel in argument, defendant did not have a fair trial.   The appellant's abstract, so far as it relates to this feature of the trial, recites that, in his opening argument to the jury, one of plaintiff's counsel adverted to the fact that defendant's witnesses were mostly their own employes, and suggested that, if the employe of a corporation of this kind did not do what his employers thought for their interest when testifying as a witness, he gets a ticket of leave.   An objection to the language was raised by the defendant, and the court responded with an admonition to counsel "not to indulge in improper remarks or draw improper conclusions."   In the closing argument for plaintiff, counsel took up some remark which he claimed had been made in argument by counsel for the defense respecting the many nationalities represented by the defendant's workmen, and suggested by indirection that the defendant had gathered in a miscellaneous lot of foreigners from the scum of Europe, because they could be employed at wages less than would be required for American labor.   Objection was again raised, and the court said:

8. APPEAL AND ERROR: review: custom and practice of trial court: determination of lower court conclusive.

"I was not listening to the argument.   Of course, it is proper to answer anything counsel has advanced on the other side, but you must keep to the facts."

No oral or written exception was presented in either case, though the official reporter, pursuant to his alleged custom, inserted in his notes in each instance the words, "Defendant excepts."   After the appeal from the judgment entered in the case, plaintiff applied to the trial court to correct the record of evidence by eliminating therefrom the reporter's notation of an exception in each instance referred to.   The application was submitted on affidavits and sustained, and

from this ruling defendant has again appealed. The affidavits quite uniformly indicate the general custom in that court for the reporter to enter exceptions in favor of the party adversely interested, to all rulings upon the introduction of evidence; but the existence of such custom with reference to objections made to the conduct of counsel in argument is a matter of dispute between lawyers whose affidavits were submitted. In making its ruling, the trial court, after stating its findings in general terms, adds:

"In sustaining points 1, 2 and 3 of the application, the court holds to the rule of practice long sustained and followed in this district to the effect that, where counsel object to statements in the argument of opposing counsel as prejudicial, that the court makes such admonition to the offending counsel as seems to it just and proper, and if complaining counsel ask no further or more drastic remedy, the court has a right to assume that he is satisfied and his silence cannot imply an exception, but if he is not satisfied with the court's admonition, and desires something in addition, he must ask it, and then if the court refuses it, and not till then, is he entitled to an exception. A different rule would be unfair to the court."

With reference to the merits of this second appeal, it is perhaps sufficient to say that no claim is made by appellant to having orally or audibly taken the exceptions on which it relies, but it bases its right to have the same left in the record upon a custom prevailing in the trial court. The existence of such custom was denied, and, in so far as it may have been of any importance, the question was one of fact for the decision of the trial court. The court found that there, was no such custom, and that the exception shown by the minutes was improperly entered therein. The trial court's own knowledge of the customs and rules of practice prevailing in its own jurisdiction cannot be ignored by this court, and, when its ruling upon a question of this nature also has sup-

*9. APPEAL AND ERROR: exceptions: conduct of counsel in argument: acquiescing in action of court.*

port of other evidence, it is conclusive upon us. There is also a large measure of justice in the court's suggestion that any rule which would permit counsel to remain silent and yet preserve their right to assign error would be unfair to the court. The court cannot be expected, at every stage of a long argument to the jury, to have its attention closely fixed upon the language of counsel, and when statements are made or language employed which opposing counsel think an abuse of privilege, fairness demands that objection be promptly made and the court given opportunity to admonish counsel having the floor or the jury or both, if in its opinion such admonition is required. This being done, if no further objection be pressed or further action demanded or exception preserved, we hold with the trial court that "it has the right to assume that the objecting party is satisfied." Nothing here said is to be construed as an approval of the line of argument to which the defendant objected, and, except as it may have been in part provoked by the thrusts of opposing counsel, or in other part may be pardoned as attributable to the exuberant enthusiasm of youth in counsel, who wears the trophies and scars of more than half a century of professional warfare, it was out of order. It was, no doubt, the right of the appellant to ask the court for a distinct charge or admonition to the jury to disregard these statements and to allow them no weight or influence in reaching a verdict, and it is to be presumed that the court would have acquiesced in the suggestion or request had it been made. While the objection was properly taken, no specific ruling was asked, and none was made, except by way of admonition to counsel to keep within the record; and, in the absence of any other showing, we think it must be presumed that no other record was desired by either party. Some reliance must also be placed upon the intelligence and integrity of jurors, who cannot fail to understand the solemnity of their obligation to return their verdict upon the evidence alone, uninfluenced by appeals to their

prejudices or passions. We find nothing in the record concerning the argument of counsel upon which a reversal of the judgment below can be properly predicated.

Other exceptions have been argued, but this opinion cannot be further extended for their discussion. We have examined them all with care, and find nothing therein necessitating any conclusion other than we have already indicated. The judgment and rulings below are, upon both appeals,— *Affirmed.*

EVANS, C. J., DEEMER and PRESTON, JJ., concur.